## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AAKASH DALAL,

　　　　　*Plaintiff*,

　　v.

UNITED STATES DEPARTMENT OF
JUSTICE et al.,

　　　　　*Defendants*.

Civil Action No. 16-1040 (TJK)

### <u>MEMORANDUM OPINION AND ORDER</u>

　　Aakash Dalal, serving a 35-year state sentence for his role in attacks on New Jersey syna-

gogues and a rabbi's home, sued Defendants, the Federal Bureau of Investigation ("FBI"), the

Executive Office of United States Attorneys ("EOUSA"), and the Federal Emergency Manage-

ment Agency ("FEMA") over requests he made to them under the Freedom of Information Act, as

well as requests he made to the FBI and EOUSA under the Privacy Act, for records related to his

investigation and prosecution.  Pending before the Court are each Defendant's motion for summary

judgment and Dalal's corresponding cross-motions.  For the reasons explained below, the Court

will (1) grant in part and deny without prejudice in part the FBI's motion for summary judgment,

and deny in part and deny without prejudice in part Dalal's cross-motion; (2) grant in part and

deny without prejudice in part EOUSA's motion for summary judgment, and deny in part and deny

without prejudice in part Dalal's cross motion; and (3) grant in part and deny without prejudice in

part FEMA's motion for summary judgment and deny in part and deny without prejudice in part

Dalal's cross-motion.

## I.   Procedural Background

### A.   FBI

Dalal requested records from the FBI first.  He asked for documents under FOIA and the Privacy Act about his "presence at the Newark, New Jersey Field Office," including logs, documents, reports, and video surveillance of the lobby and parking lot.  ECF No. 1-1 at 2.  Relatedly, he also sought logs reflecting the presence of two other individuals at the same field office on the same date.  *Id.*  About six months later, he made a second request under FOIA, seeking documents "reflecting corruption within the FBI"—specifically, the personnel file of FBI Special Agent Corey Coleman, who worked on his case, and any records relating to Special Agent Coleman's work with an individual, Wendel Stewart, who Dalal believed was an FBI informant.  ECF No. 6 ¶ 16 ("Am. Compl."); *see* ECF No. 32 at 5–6.  Two months later, Dalal made his third request under FOIA and the Privacy Act, seeking all records relating to himself.  Am. Compl. ¶¶ 20–21; ECF No. 32 at 7–8.

After the FBI denied his requests and appeals, Dalal sued.  ECF No. 1.  The Court then ordered the FBI to produce all non-exempt, responsive records and a *Vaughn* index.  *See* Minute Order of Oct. 27, 2016.  The FBI released 210 pages of responsive records in full or in part and withheld 604 records in full.  ECF No. 32 at 9.  Then the FBI released a second round of documents, disclosing 154 out of 202 pages in full or in part, including some previously withheld material.  *Id.*  Later, the FBI released one DVD containing video records.  *Id.*  The next month, the FBI reviewed 220 pages and one CD and released 48 pages in full or part.  *Id.* at 10.  Soon after that, the FBI told Dalal that it was withholding in full all remaining responsive material.  *Id.*  The FBI then moved for summary judgment, ECF No. 32, and Dalal cross-moved for the same, ECF No. 46.[1]

---

[1] Dalal also moved to file a supplemental exhibit, ECF No. 55, to which the FBI never responded.

###    B.    EOUSA

Dalal also submitted a request to EOUSA under FOIA and the Privacy Act seeking all records maintained by EOUSA about himself.  Am. Compl. ¶ 24.  EOUSA responded by informing Dalal that no responsive records could be located within the U.S. Attorney's Office for the District of New Jersey.  *Id.* ¶ 26.  After Dalal sued, the Court ordered EOUSA to produce to him all non-exempt, responsive records and a *Vaughn* index.  *See* Minute Order of Oct. 27, 2016.  EOUSA ultimately released in full 513 pages of records.  ECF No. 27-1 ¶ 6 ("Second Luczynski Decl.").

EOUSA then moved for summary judgment, along with FEMA.  ECF No. 14.  EOUSA later withdrew from the motion because it identified additional records responsive to Dalal's request.  ECF No. 23 at 1.  It ultimately provided him with an additional 68 pages of records in full and informed him that it was withholding 38 pages in full.  Second Luczynski Decl. ¶ 7.  EOUSA then filed a new motion for summary judgment, ECF No. 27, and Dalal cross-moved, ECF No. 40.

###    C.    FEMA

Dalal submitted four FOIA requests to FEMA seeking documents about federal security grants to various synagogues, churches, and other organizations and entities.  ECF No. 1-1 at 52, 57–58, 63–64.  FEMA made two productions before Dalal sued and two shortly afterward.  ECF No. 14-2 ¶¶ 7–12 ("Neuschaefer Decl.").  In total, FEMA located 1,330 responsive pages and a spreadsheet, of which it released 780 pages in full and 550 with redactions.  Neuschaefer Decl. ¶ 13.  FEMA eventually moved for summary judgment, ECF No. 14,[2] and Dalal cross-moved, ECF No. 16.[3]

_____

Thus, the Court will treat the motion as unopposed and grant it.

[2] As noted, EOUSA first joined this motion, but later withdrew from it.  ECF No. 23.

[3] After Dalal replied, he filed an amended statement of material facts.  ECF No. 36.  FEMA moved

## II.    Legal Standard

"Summary judgment is appropriately granted when, viewing the evidence in the light most favorable to the non-movants and drawing all reasonable inferences accordingly, no reasonable jury could reach a verdict in their favor." *Lopez v. Council on Am.-Islamic Rels. Action Network, Inc.*, 826 F.3d 492, 496 (D.C. Cir. 2016). "The evidence presented must show 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). "Where the nonmoving party is proceeding pro se, courts in this jurisdiction will construe the non-moving party's filings liberally." *Cunningham v. U.S. Dep't of Just.*, 40 F. Supp. 3d 71, 82 (D.D.C. 2014), *aff'd*, No. 14-5112, 2014 WL 5838164 (D.C. Cir. Oct. 21, 2014). "However, a pro se litigant still has the burden of establishing more than '[t]he mere existence of a scintilla of evidence' in support of [her] position." *Id.* (first alteration in original) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

"In the FOIA context, a district court reviewing a motion for summary judgment conducts a de novo review of the record, and the responding federal agency bears the burden of proving that it has complied with its obligations under the FOIA." *MacLeod v. U.S. Dep't of Homeland Sec.*, No. 15-cv-1792 (KBJ), 2017 WL 4220398, at *6 (D.D.C. Sept. 21, 2017) (citing 5 U.S.C. § 552(a)(4)(B)); *see also Cable News Network, Inc. v. FBI*, 271 F. Supp. 3d 108, 111 (D.D.C. 2017) ("Unlike the review of other agency action that must be upheld if supported by substantial evidence and not arbitrary or capricious, the FOIA expressly places the burden on the agency to sustain its action." (cleaned up)). Indeed, "consistent with D.C. Circuit precedent," judges in this Circuit have "proceeded to review the agencies' facts and evidence to determine whether summary judgment in favor of the agency defendants is warranted despite the lack of a coherent opposition

---

to strike it. ECF No. 37. But the submission is not "redundant, immaterial, impertinent, or scandalous," *see* Fed. R. Civ. P. 12(f), so the Court will deny the motion.

from the plaintiff." *MacLeod*, 2017 WL 4220398, at *8. "[T]he Court may . . . treat the [agency]'s factual proffers as conceded, but it must address the [agency]'s legal arguments on their merits." *King v. U.S. Dep't of Just.*, 245 F. Supp. 3d 153, 158 (D.D.C. 2017).

## III.   Analysis

Dalal claims that FOIA mandates the disclosure of all three Defendants' withholdings. He also argues that two Defendants—the FBI and EOUSA—must produce responsive records under the Privacy Act. When a plaintiff requests documents under both FOIA and the Privacy Act, the responding agency must show "that the documents fall within some exemption under *each* Act." *Martin v. Off. of Special Couns.*, 819 F.2d 1181, 1184 (D.C. Cir. 1987). "If a FOIA exemption covers the documents, but a Privacy Act exemption does not, the documents must be released under the Privacy Act; if a Privacy Act exemption but not a FOIA exemption applies, the documents must be released under FOIA." *Id.* Thus, the Court will consider his arguments under each statute in turn.

### A.   Privacy Act

Under the Privacy Act, "[e]ach agency that maintains a system of records shall," on the request of "any individual to gain access to his record or to any information pertaining to him which is contained in the system, permit him . . . to review the record and have a copy made of all or any portion thereof in a form comprehensible to him." 5 U.S.C. § 522a(d)(1). "When a plaintiff challenges an agency's withholding of documents under the Privacy Act, the court determines *de novo* whether the withholding was proper, and the burden is on the agency to sustain its action." *Barouch v. U.S. Dep't of Just.*, 962 F. Supp. 2d 30, 66 (D.D.C. 2013).

The FBI and EOUSA both claim that records responsive to Dalal's requests are exempt under Privacy Act Exemption J(2). The Court agrees. Exemption J(2) protects from disclosure systems of records "maintained by an agency or component thereof which performs as its principal

function any activity pertaining to the enforcement of criminal laws, including police efforts to prevent, control, or reduce crime or to apprehend criminals." 5 U.S.C. § 552a(j)(2).  Agencies may promulgate rules identifying such record systems.  *Id.* § 552a(j).  Here, the FBI records responsive to Dalal's requests all came from the FBI's Criminal Records System ("CRS"), ECF No. 32-1 ("Second Hardy Decl.") ¶ 54, and the FBI has exempted records maintained in CRS, *see* 28 C.F.R. § 16.96.  As for the EOUSA records, Dalal's "entire request pertain[ed] to criminal investigations," so responsive records "were necessarily compiled for law enforcement purposes."  Second Luczynski Decl. ¶ 11.  On top of that, EOUSA has exempted U.S. Attorney's Office criminal case files from disclosure.  *See* 28 C.F.R. § 16.81(a)(1).  The Court is therefore satisfied that the agencies have met their burden to show that Exemption J(2) "applies to any responsive records covered by the Privacy Act" and grants their motions for summary judgment on the same ground. *Boehm v. FBI*, 948 F. Supp. 2d 9, 18 n. 2 (D.D.C. 2013).

## B.    FOIA

FOIA "requires federal agencies to disclose information to the public upon reasonable request unless the records at issue fall within specifically delineated exemptions."  *Jud. Watch, Inc. v. FBI*, 522 F.3d 364, 366 (D.C. Cir. 2008).  It creates a "strong presumption in favor of disclosure" and "places the burden on the agency to justify the withholding of any requested documents."  *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991).  If information is already in the public domain, an agency cannot invoke an otherwise valid exemption to withhold it.  *Students Against Genocide v. U.S. Dep't of State*, 257 F.3d 828, 836 (D.C. Cir. 2001).  When an agency withholds portions of a record, it must still disclose "[a]ny reasonably segregable portion . . . after deletion of the portions which are exempt." 5 U.S.C. § 552(b).

FEMA, the FBI, and EOUSA all argue that they conducted reasonable searches responsive to Dalal's requests, properly invoked certain FOIA exemptions to withhold responsive records and

information, and complied with FOIA's segregability requirement.  The Court addresses each argument in turn.

### 1.    Adequacy of Defendants' Searches

To establish that it conducted an adequate search,

> an agency must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested, which it can do by submitting a reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched.

*Reps. Comm. for Freedom of Press v. FBI*, 877 F.3d 399, 402 (D.C. Cir. 2017) (cleaned up).  An adequate affidavit is afforded a presumption of good faith and "can be rebutted only with evidence that the agency's search was not made in good faith."  *Fischer v. U.S. Dep't of Just.*, 723 F. Supp. 2d 104, 108 (D.D.C. 2010) (quotation omitted).

#### **FBI**

At this point, the Court cannot find that the FBI's search was adequate in its entirety.  Almost all of Dalal's challenges to the FBI's search fail, but there is one issue the FBI still needs to address.

The Court begins by describing the FBI's search.  After the FBI received Dalal's FOIA requests seeking a wide range of records about FBI investigations related to him, it searched CRS for responsive records.  Second Hardy Decl. ¶ 54.  CRS is "an extensive system of records of applicant, investigative, intelligence, personnel, administrative, and general files compiled and maintained by the FBI" that "spans the entire FBI organization and encompasses the records of FBI HQ, FBI Field Offices, and FBI Legal Attaché Offices [] worldwide."  *Id.* ¶ 46.

> When a case file is opened, it is assigned a Universal Case File Number ('UCFN') consisting of three sequential components: (a) the CRS file classification number, (b) the abbreviation of the FBI Office of Origin ('OO') initiating the file, and (c) the assigned individual case file number for that particular subject matter.  Within

> each case file, pertinent documents or interest are 'serialized,' or assigned a document number in the order which the document is added to the file, typically in chronological order.

*Id.* ¶ 47 (cleaned up).  The FBI indexes information in alphabetical order by individuals, entities, or events.  *Id.* ¶¶ 48–49.  The FBI does not index every individual or other subject matter, but "only [] that information considered relevant and necessary for future retrieval." *Id.* ¶ 49.  Otherwise, it would not be an effective or efficient tool for searching and locating information.  *Id.* ¶ 57 n.11.

CRS documents are also housed in the FBI's two case-management systems, Automated Case Support ("ACS") and Sentinel.  Second Hardy Decl. ¶¶ 50, 52.  Records in ACS are indexed in the automated, electronic Universal Index.  *Id.* ¶ 51.  Since its implementation in 2012, all FBI records are added electronically to case files on Sentinel.  *Id.* ¶ 52.  Sentinel did not replace ACS, however, and records added to Sentinel are also replicated and indexed in ACS.  *Id.*  Essentially, Sentinel serves as "another portal to locate information within the vast CRS" for documents created since 2012.  *Id.*

To search for documents responsive to Dalal's requests, the FBI conducted a Universal Index search in ACS and a Sentinel index search.  Second Hardy Decl. ¶¶ 53–54.  The FBI used the search terms in Dalal's requests—specifically, several variations of his and Special Agent Coleman's names and listed case numbers.  *Id.* ¶ 54.  Through this search, the FBI located three files indexed to Dalal's name.  *Id.*  After Dalal sued, the FBI conducted a second CRS search of ACS and of Sentinel.  *Id.* ¶ 55.  The FBI uncovered the same three files and "four cross-references indexed to" Dalal's name.  *Id.*  "Through review of [these files]," the FBI found two more files containing responsive records.  *Id.*  In all, the FBI reviewed 1,236 pages, ECF No. 50-1 ¶ 8 ("Fourth Hardy Decl.").  It released 412 pages—188 in full and 224 in part.  Second Hardy Decl.

¶ 4.  Finally, the FBI states that "CRS is the only records system[] likely to maintain responsive records, and that no other records systems are likely to maintain responsive records."  Fourth Hardy Decl. ¶ 19; *see also* Second Hardy Decl. ¶ 58.

Based on these affidavits, the FBI has largely met its burden to demonstrate that it made a good-faith effort to search for the requested records where they might reasonably be found.  *See e.g.*, *Fischer*, 723 F. Supp. 2d at 109 (affording agency a presumption of good faith and finding search adequate when affidavits described the process used, databases searched, and number of documents located).  So almost all Dalal's challenges, described below, come up short.

To begin, Dalal argues that the FBI did not specify when it conducted its searches or its search cut-off dates.  ECF No. 46 at 4.  But the FBI clarified that it set the search cut-offs as the date it performed the searches.  Fourth Hardy Decl. ¶ 18.  And courts have "routinely" found "a date-of-search cut-off . . . reasonable." *McClanahan v. U.S. Dep't of Just.*, 204 F. Supp. 3d 30, 47 (D.D.C. 2016); *see also* 28 C.F.R. § 16.4(a) ("In determining which records are responsive to a request, a component ordinarily will include only records in its possession as of the date that it begins its search.").

Dalal next argues that the FBI should have searched three other locations along with CRS: the Electronic Surveillance Indices, Physical Surveillance Indices, and Bomb Arson Tracking System.  ECF No. 47 at 6–7.  He contends that the first two likely contain responsive records because the FBI's declaration "references both electronic surveillance and physical surveillance" of him. *Id.* at 6.  And the third likely contains responsive records, he says, because the FBI stated that its "search for responsive records turned up information concerning 'Plaintiff's victims of the New Jersey synagogue bombings.'"  *Id.* at 8 (quoting Second Hardy Decl. ¶ 120).  Further, he argues,

classifying the incidents as "bombings strongly 'indicates that responsive records exist in the BATS database.'"  ECF No. 47 at 8.

But the FBI has shown that it has no duty to search these other locations.  The FBI need not search the Electronic Surveillance Indices or Physical Surveillance Indices because they are also indexed in CRS such that a search of ACS and Sentinel would capture any responsive records. Fourth Hardy Decl. ¶¶ 15–16.  And it need not search the Bomb Arson Tracking System because it is a Bureau of Alcohol, Tobacco, Firearms and Explosives database; it "is not part of the FBI's system of records."  *Id.* ¶ 17.[4]

There is, however, one problem with the FBI's search.  The FBI explains that it did not contact Special Agent Coleman about the requested informant files because, while Special Agent Coleman "would have written the initial suitability reports for his confidential informants, these reports then become a matter of record and are indexed and filed within the files of the informants and/or the investigative files of the subjects of the confidential informant's report."  Fourth Hardy Decl. ¶ 21.  Fair enough.  But the FBI seems to acknowledge that there is a way to find the requested documents: by "manually search[ing] through every single informant file worked by Mr. Coleman."  *Id.*  The FBI claims that "[s]uch a search would be unduly burdensome."  *Id.*  Maybe, but it has not made a sufficient showing of undue burden.  *See Pinson v. U.S. Dep't of Just.*, 80 F. Supp. 3d 211, 217 (D.D.C. 2015) (rejecting sufficiency of agency's assertion of undue burden

---

[4] Dalal also asserts that the FBI never searched for its Newark Field Office's surveillance video from February 9, 2012, which he requested.  ECF No. 47 at 8.  But the FBI has since made clear that it "searched for and was unable to locate any records meeting [that] description." Fourth Hardy Decl. ¶ 22.  This is unsurprising because, it represents, "it has been several years since this video would have been recorded" and it was likely "overwritten and is not available for retrieval."  *Id.* In any event, "the adequacy of a FOIA search is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search."  *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003).

when the agency had merely "state[d] that all Civil Division files would need to be searched" without including any "estimate of the time required to conduct [the] requested search, the cost of such a search, or the number of files that would have to be manually searched"). Perhaps the search "would require the agency to locate, review, redact, and arrange for inspection a vast quantity of material." *Am. Fed. of Gov't Employees v. Dep't of Commerce*, 907 F.2d 203, 209 (D.C. Cir. 1990). But for all the Court knows, Special Agent Coleman only had a handful of informants, and the search would take no time at all. Thus, the FBI will need to explain why such a search of the requested informant files would be unduly burdensome before the Court can agree.[5]

### EOUSA

Turning to EOUSA, its search was adequate. After Dalal submitted a FOIA request to it for "[a]ll records or information maintained by the [U.S. Attorney's Office for the District of New Jersey] regarding or referencing 'Aakash Dalal' or 'Aakash A. Dalal,'" Second Luczynski Decl. ¶ 4, EOUSA forwarded Dalal's request to its FOIA staff in the District of New Jersey for processing, ECF No. 14-1 ¶ 7 ("Luczynski Decl."). The FOIA staff then searched the Legal Information Office Network System ("LIONS"), "which is a system used . . . to track civil, criminal, and appellate cases and investigations that are pending or closed." ECF No. 27-2 ¶ 4 ("Bryant Decl."). It is also used "to retrieve files pertaining to cases and investigations." Luczynski Decl. ¶ 7. The FOIA staff searched LIONS using variants of Dalal's name—"Aakash Dalal," "Aakash

---

[5] The FBI points out that "even if these reports could be located, they would be categorically withheld pursuant to FOIA Exemption (b)(7)(D)." Fourth Hardy Decl. ¶ 21. Probably so. But "the fact that a category of documents is likely to be exempt from disclosure does not allow an agency to preemptively exclude such a category of documents from its search." *Toensing v. U.S. Dep't of Just.*, 890 F. Supp. 2d 121, 147 (D.D.C. 2012); *see also Butt v. U.S. Dep't of Just.*, No. 19-cv-504 (JEB), 2020 WL 4436434, at *5 (D.D.C. Aug. 3, 2020) ("[T]he adequacy of a search and the application of FOIA exemptions are two separate issues; an agency cannot refuse to search a certain location just because that search could uncover materials that may fall under a privilege.").

A. Dalal," "Dalal," and "Aakash"—which reflect Dalal's requested search terms.  Bryant Decl. ¶ 4; *see* Luczynski Decl. ¶ 7.  FOIA staff conducted another search using the federal courts' Public Access to Court Electronic Records system to "confirm the cases in the District Court for New Jersey related to Mr. Dalal."  Bryant Decl. ¶ 5.  This search identified an additional pending civil case related to Dalal.  *Id.*  Next, FOIA staff "contacted the Assistant U.S. Attorneys 'AUSAS' who were identified by the LIONS and PACER databases as handling matters related to . . . Dalal.  The case records were located in the possession of the [AUSAS]."  Bryant Decl. ¶ 8.  FOIA staff then "discussed and reviewed" the identified "case records with the AUSAS."  *Id.* ¶ 9.

After identifying and reviewing the responsive records, EOUSA sent Dalal 513 pages of responsive records in full.  Luczynski Decl. ¶ 6.  Later, it informed Dalal that it would be releasing another 68 pages in full.  Second Luczynski Decl. ¶ 7.  EOUSA's affiant represents that its search was "reasonably calculated to uncover all records responsive to plaintiff's request" and that she is unaware "of any other locations . . . where records that might be responsive to plaintiff's request are likely to be located."  Bryant Decl. ¶ 12.  Thus, EOUSA's reasonably detailed affidavit has shown an adequate search, and the court affords it a presumption of good faith.  *See Greenberg v. U.S. Dep't of Treasury*, 10 F. Supp. 2d 3, 13 (D.D.C. 1998).

Dalal does not rebut this presumption.  First, he accuses EOUSA of making "misleading statements" about the scope of responsive records and the location of documents.  ECF No. 40 at 19.  He identifies two supposedly deceptive assertions: (1) a letter sent to Dalal stating that there were no records responsive to his request and (2) a representation that the 513 pages of civil records disclosed to him at one point were maintained in a criminal case file system.  *Id.* at 6–7.  Neither shows bad faith.  As to the "no records" response, EOUSA has explained that it was an administrative error, intended as a response to a different FOIA request from Dalal.  ECF No. 48 at 3–4.

Soon after, EOUSA corrected its mistake by searching and sending Dalal responsive records. *Id.* Likewise, as to the location of the civil records, the reference to a criminal case file system was also an error; EOUSA later clarified that the civil records were in LIONS and confirmed that with a court records search. *Id.* at 4–5.

Dalal next argues that EOUSA improperly delayed processing responsive criminal files. ECF No. 40 at 21. But EOUSA has adequately explained this issue as well. When the civil records were processed and released, EOUSA did not process the criminal records "due to possible ongoing criminal proceedings related to the case." Second Luczynski Decl. ¶ 7. "Given [Dalal's] offense, which was thought to be tied to domestic terrorism, EOUSA needed to be completely clear what the Criminal File records contained. Until that time, the records were not exempt, but rather excluded until appropriate consideration was given." ECF No. 48-2 ¶ 7 ("Third Luczynski Decl."). Dalal argues that "[t]here is no provision in FOIA that allows an agency to conceal the existence of responsive records 'due to possible ongoing criminal proceedings.'" ECF No. 40 at 20. But the question here is not whether EOUSA correctly excluded or withheld the documents under an exemption—it ultimately processed and released all non-exempt, responsive criminal records just three months after the civil records. Second Luczynski Decl. at 20–21 ("Ex. D"). This short processing delay does not show bad faith or that the search performed was inadequate.

Finally, Dalal asserts that EOUSA "replac[ed] responsive records with newly generated online news articles," ECF No. 40 at 19, which the Court also finds meritless. To support this claim, Dalal says that EOUSA's FOIA staff in New Jersey "claims to have sent the responsive [documents] to [EOUSA] . . . on July 14, 2016." *Id.* at 8. Yet, he asserts, "[n]ine pages of records disclosed by EOUSA, consisting of four online news articles, were clearly generated on September 29, 2016—well after EOUSA claims to have received the records from" New Jersey, as shown by

"[t]he timestamp on the bottom right hand corner of each of the nine pages." *Id.* EOUSA explains that the documents were sent to EOUSA in October 2016—not July as Dalal asserts—so the time stamps are not concerning in the first place. ECF No. 48 at 7–8. Rather, in July, FOIA staff in New Jersey sent EOUSA a "completed interagency form regarding the status of Dalal's FOIA/PA request," and they advised EOUSA about an ongoing criminal investigation and of the existence of civil court documents. ECF No. 48-1 ¶ 13. And, as EOUSA points out, documents may show a later date stamp reflecting when they were printed for release, even if they were examined for releasability earlier. Third Luczynski Decl. ¶ 8–9. In any event, for these reasons the timestamps do not suggest that EOUSA replaced responsive records with news articles or otherwise suggest bad faith.

### FEMA

FEMA's search was adequate as well. After receiving each of Dalal's four FOIA requests, FEMA's Disclosure Branch directed the agency's Grant Program Directorate ("Directorate"), which administers the Security Initiative grant program, to search for responsive records. Neuschaefer Decl. ¶¶ 7–11. The Directorate searched its Non-Disaster Grants database, the electronic grants management system where grant awards are maintained. *Id.* Each time, the Directorate used the search terms and date ranges that Dalal provided in his requests. *Id.*; ECF No. 19-1 ¶ 7. The Directorate searched only that database because the requested information is either maintained in the Non-Disaster Grants database or not collected and maintained by FEMA at all. *Id.* ¶ 3, 6. Further, FEMA confirmed that it "searched all locations likely to contain records responsive to Plaintiff's FOIA requests." *Id.* ¶ 3. After identifying potentially responsive records, the Directorate provided the documents to the Disclosure Branch for an analyst to process and ensure that the records were responsive. Neuschaefer Decl. ¶¶ 7–11; ECF No. 19-1 ¶ 4. In all,

FEMA identified 1,330 pages of responsive records and released 780 in full and 550 in part.  ECF No. 14-3 ¶ 9.

FEMA's affidavits are also entitled to a presumption of good faith.  And based on these affidavits, it has met its burden to demonstrate that it made a good-faith effort to search for the requested records where they might reasonably be found.  "Thus, summary judgment on the adequacy of the search is proper unless plaintiffs can contradict [FEMA's] account of the search procedure or raise evidence of [FEMA's] bad faith."  *See Greenberg*, 10 F. Supp. 2d at 13; *see also, e.g.*, *Fischer*, 723 F. Supp. 2d at 109 (affording agency a presumption of good faith and finding search adequate when affidavits described the process used, databases searched, and number of documents located).

Once again, Dalal fails to rebut the presumption.  At the outset, he attacks the sufficiency of the affidavits, arguing that FEMA did not identify the search terms it used or explain how the Non-Disaster Grants database can be searched.  ECF No. 16 at 20.  Dalal is incorrect.  FEMA did in fact provide this information, explaining that it used the search terms and date ranges that Dalal provided in his requests.  Neuschaefer Decl. ¶¶ 7–11.  FEMA also specified that "in instances where information pertaining to a specific award was requested, [the Directorate] searched [the Non-Disaster Grants database] using the name of the subgrantee listed on the request (e.g. []Congregation Beth El), the location (e.g. New Jersey), and the time period (e.g. 2012-2013)," while "[i]n instances where information pertaining to a grouping of awards was requested, the Directorate] searched [the Non-Disaster Grants database] using the location (e.g. New Jersey) and the time period (e.g. January 1, 2012 through March 1, 2016)."  ECF No. 19-1 ¶ 7.

Next, Dalal attacks the search methodology, contending that FEMA "failed to search databases and offices clearly reference[d] in the responsive records," "failed to search its National

Emergency Management Information System," "failed to produce [records] that in fact exist," "produced [inaccurate records] that exist in some other form," and "should have searched for and disclosed complete versions of the applications that it surely requested of grant applicants before awarding them substantial sums of money."  ECF No. 16 at 20–21, 25, 27–28.

To be sure, "positive indications of overlooked materials" may suggest that a search was inadequate.  *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 326 (D.C. Cir. 1999).  But "the adequacy of a FOIA search is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search."  *Iturralde*, 315 F.3d at 315; *see also Fischer*, 723 F. Supp. 2d at 109–110 ("Even plaintiff's showing of specific responsive documents that exist and were not produced does not rebut the presumption of good faith accorded to agency affidavits.").  As already described, FEMA has met its burden by explaining its search methods in reasonable detail and confirming that the Non-Disaster Grants database contains all award documents and that "[n]o other system of records maintained by FEMA would likely produce additional records."  ECF No. 19-1 ¶¶ 3, 6.  And in any event, Dalal has not identified any "positive indications of overlooked materials," but only his unfounded assertions that other documents must exist. The presumption of good faith "cannot be rebutted by purely speculative claims about the existence and discoverability of other documents."  *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quotation omitted).[6]

---

[6] Dalal's miscellaneous claims of inaccurate records and misconduct, *see, e.g.*, ECF No. 16 at 23, are unavailing because he offers nothing but speculation to support his accusations of bad faith. *See, e.g.*, *Physicians for Human Rights v. U.S. Dep't of Defense*, 675 F. Supp. 2d 149, 158 (D.D.C. 2009) ("[The] presumption can only be rebutted with clear evidence of bad faith.").  For the same reason, the Court denies Dalal's request for discovery under Rule 56(d).  *See* ECF No. 16 at 47–49; *see also Landmark Legal Found. v. EPA*, 959 F. Supp. 2d 175, 183–84 (D.D.C. 2013) ("Discovery in FOIA cases is rare and should be denied" unless "the plaintiff raises a sufficient question as to the agency's good faith in processing documents." (cleaned up)).

\*       \*       \*

For these reasons, the Court finds that EOUSA's and FEMA's searches were adequate. But it cannot find all of the FBI's search adequate, at least not yet. Thus, the FBI's motion for summary judgment on this issue will be denied without prejudice, and Dalal's cross-motion will also be denied without prejudice. The FBI may file a supplemental declaration and renewed motion for summary judgment to explain why it would be an undue burden to search for the requested informant records in the way it describes.

### 2.      Exemptions Claimed by Defendants

The Court next turns to Defendants' claimed exemptions. "The agency bears the burden to establish the applicability of a claimed exemption to any records or portions of records it seeks to withhold." *Am. Immigr. Lawyers Ass'n v. Exec. Off. for Immigr. Rev.* ("*AILA*"), 830 F.3d 667, 673 (D.C. Cir. 2016). "Summary judgment is warranted on the basis of agency affidavits when the affidavits describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (quoting *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984)). That is, the agency must provide a "logical" or "plausible" justification for the exemption. *Id.* (quoting *Wolf v. CIA*, 473 F.3d 370, 375 (D.C. Cir. 2007)). The agency cannot rely on "conclusory and generalized allegations of exemptions." *Morley v. CIA*, 508 F.3d 1108, 1114 (D.C. Cir. 2007) (quoting *Founding Church of Scientology of Wash., D.C., Inc. v. NSA*, 610 F.2d 824, 830 (D.C. Cir. 1979)). Defendants invoked these exemptions, which the Court will analyze in turn: FOIA Exemptions 1, 3(A), 5, 7(A), 7(C), 7(D), and 7(E).

### a.      Exemption 1

The FBI—and only the FBI—asserts Exemption 1, claiming it exempts the disclosure of certain information that describes intelligence activities, intelligence sources, and methods used by the FBI to gather intelligence.  *See* Second Hardy Decl. ¶¶ 92–94; ECF No. 60-2 at 16 n.12. The Court finds that the FBI has met its burden to claim this exemption.

Exemption 1 provides that FOIA's disclosure provisions "[do] not apply to matters that are . . . (A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order."  5 U.S.C. § 552(b)(1).  Relevant here, Executive Order No. 13,526 provides that information may be classified under the order if:

> (1) an original classification authority classifies the information; (2) the information is under the control of the United States Government; (3) the information falls under one or more of the categories of information listed in § 1.4 of the order; and (4) the classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, and the authority is able to identify or describe the damage.

Exec. Order No. 13,526 ("E.O. 13526"), 75 Fed. Reg. 707 § 1.1 (Dec. 29, 2009).  And one of the classification categories in § 1.4 is information that constitutes "intelligence activities (including covert action), intelligence sources or methods, or cryptology."  *See* E.O. 13526 § 1.4(c); Second Hardy Decl. ¶ 90.

In this Circuit, courts "accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record because the Executive departments responsible for national defense and foreign policy matters have unique insights into what adverse affects [sic] might occur as a result of a particular classified record."  *Larson*, 565 F.3d at 865 (quoting *Ctr. for Nat'l Sec. Stud. v. U.S. Dep't of Just.*, 331 F.3d 918, 927 (D.C. Cir. 2003)).

If an agency's statements supporting exemption contain reasonable specificity of detail as to demonstrate that the withheld information logically falls within the

> claimed exemption and evidence in the record does not suggest otherwise . . . the court should not conduct a more detailed inquiry to test the agency's judgment and expertise or to evaluate whether the court agrees with the agency's opinions.

*Id.* at 865.  Courts have "consistently deferred to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review." *Id.* (quoting *Ctr. for Nat'l Sec. Stud.*, 331 F.3d at 927).

Here, the FBI's declarations verify, with reasonable specificity, that all the prerequisites of E.O. 13526 were met.  *See* Second Hardy Decl. ¶¶ 89–94; Fourth Hardy Decl. ¶¶ 33–37.  David Hardy—the FBI's Section Chief of the Record/Information Dissemination Section at the Records Management Division, and an original classification authority—designated the information as "Secret" and determined that it "is under the control of the United States Government."  *See* Second Hardy Decl. ¶ 91; Fourth Hardy Decl. ¶ 33.  That satisfies the first two elements of E.O. 13526.  Hardy also determined that the information "describes and pertains to intelligence activities, sources, and methods utilized by the FBI in gathering intelligence information," and therefore falls within § 1.4(c) of E.O. 13526.  Fourth Hardy Decl. ¶ 34.  He also concluded that "the release of this information could permit hostile non-U.S. persons, entities, and foreign governments to appraise the scope, focus, location, target, and capabilities of the FBI's intelligence-gathering methods and activities, and allow hostile agents to devise countermeasures to circumvent these intelligence activities or methods and render them useless in providing intelligence information."  *Id.* ¶ 36.

As additional support for its withholding, the FBI submitted a classified declaration *in camera*, which the Court has reviewed.  *See* ECF No. 33-1.  Based on these declarations, the Court finds that Exemption 1's requirements are satisfied because the information was specifically authorized to be kept secret in the interest of national security or foreign policy under an executive

order, and it was properly classified.  Given the substantial weight the Court must afford these declarations and the reasonable specificity with which Hardy explained the exemption's applicability, the Court need "not conduct a more detailed inquiry to test the agency's judgment and expertise or to evaluate whether the court agrees with the agency's opinions."  *Larson*, 565 F.3d at 865.

Dalal attacks the FBI's declarations on two grounds.  First, he contends that the affidavits are not reasonably detailed.  ECF No. 46 at 16–17.  But the Court finds that the public declarations, combined with the FBI's *in camera* declaration and its *Vaughn* index, ECF No. 60-2, have described and explained the withholdings with reasonable detail.  Second, Dalal argues that the FBI stated that "the information at issue 'has been the subject of declassification in accordance with existent regulations.'"  ECF No. 46 at 16 (quoting Second Hardy Decl. ¶ 98).  The FBI confirmed, though, that the information remains classified and that it had merely been "submitted for declassification review."  Fourth Hardy Decl. ¶ 38.

For these reasons, the Court will grant the FBI summary judgment as to its Exemption 1 withholdings.

### b.      Exemption 3

Both the FBI and EOUSA invoke Exemption 3.  Under that exemption, FOIA's disclosure requirements do not apply to matters that are "specifically exempted from disclosure by statute . . . if that statute . . . (i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld."  5 U.S.C. § 552(b)(3)(A).  Thus, the agency "need only show that the statute claimed is one of [the] exemption[s] as contemplated by Exemption 3 and that the withheld material falls within the statute."  *Larson*, 565 F.3d at 865.  "Exemption 3 differs from other FOIA exemptions in that its applicability depends less on the detailed factual contents

of specific documents; the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage." *Nat'l Sec. Couns. v. CIA*, 320 F. Supp. 3d 200, 214–15 (D.D.C. 2018) (quotation marks omitted).

**FBI**

The FBI raises two statutes, Federal Rule of Criminal Procedure 6(e)[7] and Section 102(A)(i)(1) of the National Security Act of 1947 ("NSA"), as the basis for withholding under Exemption 3 certain grand jury materials and materials pertaining to intelligence activities, sources, and methods, respectively. ECF No. 32 at 24–25. The Court finds the FBI properly invoked this exemption.

Rule 6(e) bars disclosure of matters before a grand jury. *See* Fed. R. Crim P. 6(e)(2)(B). "[W]hen combined with . . . Exemption 3, [it] prohibits the disclosure of certain grand jury matters even in the face of a valid FOIA request." *Ford v. U.S. Dep't of Just.*, 208 F. Supp. 3d 237, 248 (D.D.C. 2016) (quotations omitted). "The relevant inquiry for this Court is whether disclosure of the information requested would tend to reveal some secret aspect of the grand jury's investigation, such matters as the identities of witnesses or jurors, the substance of testimony, the strategy or direction of the investigation, the deliberations or questions of jurors, and the like." *Lopez v. U.S. Dep't of Just.*, 393 F.3d 1345, 1349 (D.C. Cir. 2005) (cleaned up).

The FBI has adequately explained that the withheld grand jury materials fall within Rule 6(e)'s protections. It invoked this justification to withhold several subpoena responses in full and to redact various electronic communications, letters, and subpoena responses. ECF No. 60-2 at 17–18. The material withheld consists of "names and/or identifying information of third parties

---

[7] Rule 6(e) is considered a statute for purposes of Exemption 3 because it was "positively enacted by Congress." *Fund for Const. Gov't v. Nat'l Archives & Recs. Serv.*, 656 F.2d 856, 867 (D.C. Cir. 1981) ("It is quite apparent that by any definition Fed. R. Crim. P. 6(e) is a statute.").

who were either subpoenaed to provide testimony or actually provided testimony to the Federal Grand Jury; the company names and/or employees served with Federal Grand Jury subpoenas; information identifying specific records subpoenaed by the Federal Grand Jury; and other information on the internal workings of the Federal Grand Jury."  Second Hardy Decl. ¶ 96; *see also* Fourth Hardy Decl. ¶ 7.  This is information protected by Rule 6(e).  *See Lopez*, 393 F.3d at 1349–50 ("All grand jury subpoenas . . . fall within FOIA's third exemption."); *Fund for Const. Gov't*, 656 F.2d at 869–70 ("Witness names are clearly covered, as are documents subpoenaed as exhibits" and "[p]otential witnesses and potential documentary exhibits" when disclosure "would reveal the direction and strategy of the investigation.").  And the FBI confirms that "only that information which explicitly discloses matters occurring before a Federal Grand Jury has been withheld."  Second Hardy Decl. ¶ 96.

Dalal does not object to any of those representations and instead challenges the following specific assertion: "'The disclosure of this material would clearly violate the secrecy of the grand jury proceedings revealing the <u>inner workings that led to the Grand Jury indictment of Plaintiff</u>, as well as other possible violations being investigated.'"  ECF No. 46 at 17 (quoting Second Hardy Decl. ¶ 96).  He argues that, because no federal prosecution was ever brought against him, this must refer to state indictments and the FBI consequently is "withholding information regarding a state grand jury which would obviously not fall under the Federal Rules of Criminal Procedure." ECF No. 47 at 17–18.  But even though Dalal was never federally indicted, the FBI is clear that the subpoenas withheld were still federal grand jury subpoenas.  Fourth Hardy Decl. ¶¶ 7, 39.  And even if they did not lead to federal charges against him, their release would no doubt "shed light on the inner workings of a Federal Grand Jury" and "identify the specific records subpoenaed" as well as "the company names and/or employees served with" the subpoenas.  *Id.* ¶ 7.  Thus, his

objection lacks merit, even if the FBI's representation about the nature of Dalal's indictment was mistaken.

Turning to the NSA, that statute provides that the Director of National Intelligence "shall protect from unauthorized disclosure intelligence sources and methods." 50 U.S.C. § 3024(i)(1). The D.C. Circuit has interpreted this language to exempt from disclosure material "that the agency 'demonstrates . . . can reasonably be expected to lead to unauthorized disclosure' of intelligence methods or sources." *Nat'l Sec. Couns. v. CIA*, 320 F. Supp. 3d 200, 215 (D.D.C. 2018) (quoting *Wolf*, 473 F.3d at 377). Because of the "national-security interests implicated by such material, courts give 'even greater deference to [FBI] assertions of harm to intelligence sources and methods under the National Security Act.'" *Id.* (quoting *Wolf*, 473 F.3d at 377).

The FBI has carried its burden to invoke Exemption 3 under this statute as well. It represents that the information withheld was originally classified at the confidential or secret level and "the FBI's intelligence sources and methods would be revealed if any of the withheld information is disclosed." Second Hardy Decl. ¶ 98. And the FBI's classified declaration submitted *in camera* provides more detail. *See* ECF No. 33-1. All of this is sufficient. Dalal argues that "the FBI relies on conclusory statements" and that "[a] simple reference to 'sources and methods' cannot allow the FBI to carry its burden here." ECF No. 46 at 18. But "given the 'greater deference afforded the Agency under the National Security Act,'" *Nat'l Sec. Couns.*, 320 F. Supp. 3d at 216 (quoting *Wolf*, 473 F.3d at 378), the Court is convinced that the FBI has met its burden, *see Am. Ass'n of Women, Inc. v. U.S. Dep't of Just.*, 167 F. Supp. 3d 136, 143 (D.D.C. 2016) (finding similar language in declaration adequate).

Because the FBI met its burden to invoke Exemption 3, the Court will grant its motion for summary judgment as to these withholdings.

**EOUSA**

EOUSA invokes Rule 6(e), as well as Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520, to withhold under Exemption 3 four grand jury subpoenas totaling seven pages.  Second Luczynski Decl. ¶ 16.  The Court finds its withholding proper.

To begin, the Court agrees with EOUSA that, based on the standard outlined above, Rule 6(e) covers the subpoenas in their entirety.  Second Luczynski Decl. ¶¶ 14, 16.  As EOUSA explains, release of the subpoenas "would reveal the identities of witnesses and provide information about the substance of testimony given before the grand jury, the strategy or direction of the investigation," and "the deliberations or questions of the grand jurors."  Third Luczynski Decl. ¶ 12; *see Lopez,* 393 F.3d at 1349–50 ("All grand jury subpoenas . . . fall within FOIA's third exemption.").

Dalal does not dispute that the subpoenas are covered by Rule 6(e) and "does not seek the release of" these records "if they are indeed grand jury subpoenas."  ECF No. 40 at 21–22.  He does, however, ask the Court to review the documents *in camera* "to ensure that they are what EOUSA claims," given what he characterizes as "EOUSA's unlawful and repeated efforts to conceal even the existence of the four purported grand jury subpoenas."  *Id*.  But Dalal provides no evidence of bad faith to support his assertion that EOUSA has mischaracterized the records.  The Court accordingly has no reason to believe they are anything but what EOUSA has represented—grand jury subpoenas that Dalal has conceded he does not seek.  *See Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 509 (D.C. Cir. 2011) (citing *Larson*, 565 F.3d at 862).  Thus,

the Court finds EOUSA's invocation of Exemption 3 in connection with Rule 6(e) sufficient and declines to review the documents *in camera*.[8]

For these reasons, the Court grants summary judgment for EOUSA on its assertion of Exemption 3.

### c.    Exemption 5

The FBI and EOUSA also invoke Exemption 5.  This exemption excepts from mandatory disclosure requirements "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  "It incorporates three traditional civil-discovery privileges: (1) the deliberative-process privilege; (2) the attorney-client privilege; and (3) the attorney work-product privilege." *Am. Immigr. Council v. U.S. Dep't of Homeland Sec.*, 21 F. Supp. 3d 60, 74 (D.D.C. 2014); *see also Rockwell Int'l Corp. v. U.S. Dep't of Just.*, 235 F.3d 598, 601 (D.C. Cir. 2001) ("[T]he parameters of Exemption 5 are determined by reference to the protections available to litigants in civil discovery; if material is not available in discovery, it may be withheld from FOIA requesters.").

"As [Dalal] appear[s] to share [the agencies'] assumption that the documents involved here qualify as inter-agency or intra-agency memoranda under Exemption 5 (and would therefore be

---

[8] As noted above, EOUSA also invokes the Omnibus Crime Control and Safe Streets Act as another basis for protecting wiretap information that apparently is encompassed within the subpoenas.  As courts in this Circuit have explained, "'intercepted communications' obtained pursuant to a Title III wiretap fall 'squarely within the scope' of Exemption 3," as do wiretap applications. *Ewell v. U.S. Dep't of Just.*, 153 F. Supp. 3d 294, 304 (D.D.C. 2016) (quoting *Lam Lek Chong v. Drug Enf't Admin.*, 929 F.2d 729, 733 (D.C. Cir. 1991)).  That said, Dalal argues that EOUSA has not sufficiently described the wiretap material contained within the subpoenas—that is, it has not explained what it means by "wiretap information" with enough specificity.  Admittedly, EOUSA's explanation is scant.  EOUSA says only that the grand jury subpoenas "involved wiretap-related information."  Third Luczynski Decl. ¶ 12.  But the Court need not decide this question because the information is apparently contained within the grand jury subpoenas—records covered by Rule 6(e) in their entirety, which Dalal does not seek anyway.  If the Court misunderstands EOUSA's representations on this point, it should, of course, correct the record.

exempt if they [meet the relevant privilege elements])," the Court "will assume without deciding that they are such memoranda" and proceed to considering whether they qualify for any of the three privileges. *Ancient Coin Collectors Guild*, 641 F.3d at 513.

### i.        The Deliberative Process Privilege

The FBI invokes the deliberative process privilege to withhold portions of Dalal's law enforcement records. *See* Fourth Hardy Decl. ¶ 47. But the Court agrees with Dalal that the FBI has not (at least yet) provided enough information to invoke the deliberative process privilege for these documents.

The deliberative process privilege "shields 'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 357 (D.C. Cir. 2021) (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975)). "The privilege is rooted in the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news. To encourage candor, which improves agency decisionmaking, the privilege blunts the chilling effect that accompanies the prospect of disclosure." *Jud. Watch, Inc. v. U.S. Dep't of Just.*, 20 F.4th 49, 54 (D.C. Cir. 2021) (cleaned up).

For the privilege to apply, a document must be both "predecisional and deliberative." *Machado Amadis v. Dep't of State*, 971 F.3d 364, 370 (D.C. Cir. 2020). A "predecisional" document is "generated *before* the adoption of an agency policy." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980) (emphasis added). And a "deliberative" document "reflects the give-and-take of the consultive process." *Reps. Comm.*, 3 F.4th at 362 (cleaned up). To meet its burden, the agency "must explain the role [the document] played in administrative

decisionmaking—the 'who, what, where, and how' of internal governmental deliberations." *Campaign Legal Ctr. v. U.S. Dep't of Just.*, 34 F.4th 14, 23 (D.C. Cir. 2022) (quoting *Jud. Watch*, 20 F.4th at 57).  That usually requires showing "the roles of the document drafter and recipients, the nature of the withheld content, and the stage within the broader deliberative process in which the withheld material operates." *Id.* (cleaned up).  The agency should also "explain the way in which the withheld material facilitated agency deliberation." *Id.* (cleaned up).[9]

The FBI argues that the deliberative process privilege applies to the withheld pages from Dalal's law enforcement records because the pages contain "preliminary opinions, evaluations, and comments of [Newark Field Office] Special Agents pertaining to the criminal proceedings" against Dalal.  Second Hardy Decl. ¶ 108; Fourth Hardy Decl. ¶¶ 47–48.  The FBI says that releasing the records would reveal deliberations related to "investigative/prosecutorial strategy as it pertained to [Dalal], . . . the maintenance and preservation of investigative records, the consensual monitoring of [Dalal], and litigation strategy as it pertained to testimony of federal employees." Fourth Hardy Decl. ¶ 48.  It then argues that "[d]isclosure of the protected information . . . would reveal internal discussions and information FBI personnel thought were pertinent to their analysis, and their compilation and sorting of facts, all of which were used in determining to make final

---

[9] Under a 2016 amendment to FOIA, agencies are barred from withholding exempt material if the agency does not "'reasonably foresee[] that disclosure would harm an interest protected by' a FOIA exemption." *Reps. Comm. for Freedom of the Press v. U.S. Customs & Border Prot.*, 567 F. Supp. 3d 97, 109 (D.D.C. 2021) (quoting 5 U.S.C. § 552(a)(8)(A)(i)(I)).  But that amendment took "effect on the day of enactment"—which was June 30, 2016—and applies only to "request[s] for records . . . made after" that date.  FOIA Improvement Act of 2016, Pub. L. No. 114-185, § 6, 130 Stat. 538, 544–45; *see also Bagwell v. U.S. Dep't of Just.*, No. 15-cv-531 (CRC), 2022 WL 602448, at *11 (D.D.C. Mar. 1, 2022); *Jud. Watch, Inc. v. U.S. Dep't of State*, No. 15-cv-687 (JEB), 2021 WL 3363423, at *8 (D.D.C. Aug. 3, 2021).  The requests here were made *before* June 30, 2016.

decisions regarding the investigative material collected and analyzed during the criminal proceedings of the subject." *Id.*

These representations are not enough. "Assessing whether a record is pre-decisional or deliberative necessarily requires identifying the decision (and the associated decisional process) to which the record pertains." *Citizens for Resp. & Ethics in Wash. ("CREW") v. U.S. Dep't of Just.*, 45 F.4th 963, 972 (D.C. Cir. 2022). But this nebulous explanation leaves unclear what decision or decisional process is at issue. *See 100Reporters LLC v. U.S. Dep't of Just.*, 248 F. Supp. 3d 115, 152 (D.D.C. 2017) (finding DOJ's "view of the deliberative process at issue . . . overbroad" when DOJ described the process as "helping the DOJ deliberate on whether [a party] had satisfied its obligations under the Plea Agreement"). In fact, it sounds like there are multiple sub-decisions involved—how to investigate Dalal, how to prosecute Dalal, and how to maintain and preserve records—each "with a distinct deliberative process" that the FBI bears the burden of identifying. *Id.* at 152. On top of that, the document "descriptions are too vague for the Court to discern the function and significance of the documents in the agency's decisionmaking process." *Nat'l Sec. Couns. v. CIA*, 960 F. Supp. 2d 101, 190 (D.D.C. 2013). The FBI fails to sufficiently explain "where" or "how" any particular withholding operated in the relevant deliberative process. *Jud. Watch*, 20 F.4th at 56; *see also CREW*, 45 F.4th at 972 (even where an "agency never reaches a final decision," it still must "tie the withheld records to a decision-making process" and identify "the role played by the documents in issue in the course of that process" (cleaned up)).

The Circuit has also said that an agency invoking the deliberative process privilege should explain "the roles of the document drafters and recipients." *Campaign Legal Ctr. v. U.S. Dep't of Just.*, 34 F.4th 14, 23 (D.C. Cir. 2022) (cleaned up). Such information can be critical: "A document from a junior to a senior is likely to reflect his or her own subjective opinions and will clearly have

no binding effect on the recipient," while "one moving from senior to junior is far more likely to manifest decisionmaking authority and to be the denouement of the decisionmaking rather than part of its give-and-take." *Access Reps. v. U.S. Dep't of Just.*, 926 F.2d 1192, 1195 (D.C. Cir. 1991); *see also Coastal States*, 617 F.2d at 868. Yet the FBI leaves unclear both who drafted the documents at issue and who received them. Both Special Agents and attorneys within DOJ's Office of General Counsel appear to have been involved—but the FBI does not explain their roles. *See* Fourth Hardy Decl. ¶¶ 47–48.

Thus, the FBI has not met its burden of showing that the material is properly withheld under the deliberative process privilege. The FBI's motion for summary judgment on this assertion of privilege will therefore be denied without prejudice, and Dalal's cross-motion will also be denied without prejudice. To the extent that these withholdings are not otherwise covered by the attorney-client privilege, the attorney work-product privilege, or some other exemption altogether, to withhold them the FBI must provide a more detailed declaration or updated *Vaughn* index alongside a renewed motion for summary judgment.

### ii.        The Attorney-Client Privilege

The FBI also asserted the second form of privilege—the attorney-client privilege. This privilege protects "confidential communications between an attorney and his client relating to a legal matter for which the client has sought professional advice." *Pub. Emps. for Env't Resp.* v. *EPA*, 213 F. Supp. 3d 1, 22 (D.D.C. 2016) (quoting *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 252 (D.C. Cir. 1977)). The privilege seeks "to ensure that a client's confidences are protected, encouraging clients to be honest with their attorneys." *Competitive Enter. Inst. v. EPA*, 232 F. Supp. 3d 172, 184 (D.D.C. 2017). "In the FOIA context, the agency is the 'client' and the agency's lawyers are the 'attorneys' for the purposes of attorney-client privilege." *Jud. Watch, Inc. v. U.S. Dep't of Treasury*, 802 F. Supp. 2d 185, 200 (D.D.C. 2011). "To be

privileged, a communication must be 'for the purpose of securing primarily either (i) an opinion

on law or (ii) legal services or (iii) assistance in some legal proceeding.'" *Muttitt v. Dep't of State*,

926 F. Supp. 2d 284, 308–09 (emphasis omitted) (quoting *In re Grand Jury*, 475 F.3d 1299, 1304

(D.C. Cir. 2007)).  "[I]t falls to the government to prove, through 'detailed and specific infor-

mation,' that the withheld information falls within the domain of the attorney-client privilege."

*Am. Immigr. Council*, 21 F. Supp. 3d at 70.

The FBI asserted the attorney-client privilege to withhold in full or in part 47 pages of

communications "between FBI personnel and its Office of General Counsel ("OGC") agency at-

torneys."  Second Hardy Decl. ¶ 102.  The Court agrees that the privilege applies.  According to

the FBI, the withheld communications were confidential and would reveal OGC's analysis in for-

mulating a legal position.  Second Hardy Decl. ¶ 102.  The legal advice pertained specifically to

"the legal requirements and protocols required prior to FBI personnel testifying in court proceed-

ings."  *Id.*  With these descriptions, the FBI has provided enough information to show that the

material is properly withheld under the attorney-client privilege.  *See Bloche v. Dep't of Def.*, 414

F. Supp. 3d 6, 45 (D.D.C. 2019) (internal quotation marks omitted) (finding agency's explanation

sufficient where it said that communications "reflect advice that was being sought as well as the

recommendations provided by the agency's counsel" and "that the material was confidential");

*Touarsi v. U.S. Dep't of Just.*, 78 F. Supp. 3d 332, 345 (D.D.C. 2015) (privilege applied when the

agency withheld "legal advice from FBI attorneys to government agents and employees concern-

ing investigation strategies and a potential prosecution" without providing more details).

Dalal argues that the FBI's justification is "conclusory" without explaining in what respect

he finds it so.  ECF No. 46 at 19.  The FBI has met the basic requirements, as described above,

and "requiring the Bureau to divulge details of the communications beyond their general subject

matter . . . is not necessary for the Court to determine whether the information is privileged and would invade the very privilege itself." *Touarsi*, 78 F. Supp. 3d at 346. Thus, the Court will grant it summary judgment as to the communications described above.

### iii.        The Attorney Work-Product Privilege

Both the FBI and EOUSA also invoke a final privilege, the attorney work-product privilege. This privilege protects "documents and tangible things that are prepared in anticipation of litigation or for trial by an attorney." *Am. Immigr. Council*, 21 F. Supp. 3d at 78 (internal quotation marks omitted) (quoting Fed. R. Civ. P. 26(b)(3)(A)). Courts have noted that "the privilege is relatively broad, encompassing documents prepared for litigation that is foreseeable, if not necessarily imminent." *Id.* (internal quotation marks omitted). But "[n]ot every document created by a government lawyer . . . qualifies for the privilege." *Nat'l Ass'n of Crim. Def. Laws. v. U.S. Dep't of Just. Exec. Off. for U.S. Att'ys* (*"NACDL"*), 844 F.3d 246, 251 (D.C. Cir. 2016). This Circuit has "long required a case-specific determination that a particular document in fact was prepared in anticipation of litigation before applying the privilege to government records." *Id.*

To determine whether a document was prepared in anticipation of litigation, this Circuit applies a "'because of' test, asking whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *Id.* (quoting *United States v. Deloitte LLP*, 610 F.3d 129, 137 (D.C. Cir. 2010)). To satisfy this test, the "attorney who created the document must have 'had a subjective belief that litigation was a real possibility,' and that subjective belief must have been 'objectively reasonable.'" *NACDL*, 844 F.3d at 251 (quoting *In re Sealed Case*, 146 F.3d 881, 884 (D.C. Cir. 1998)). To satisfy its evidentiary burden, the agency "must (1) provide a description of the nature and contents of the withheld document, (2) identify the document's author or origin (by

job title or otherwise), (3) describe the factual circumstances that surround the document's creation, and (4) provide some indication of the type of litigation for which the document's use is at least foreseeable." *Am. Immigr. Council*, 21 F. Supp. 3d at 78.

**FBI**

The FBI asserted the work-product privilege to withhold in full or in part 46 pages of electronic communications, forms, and other "investigative documents" prepared by special agents in the Newark Field Office "to memorialize conversations between themselves and the AUSA concerning the criminal proceedings of the subject." Second Hardy Decl. ¶ 104; ECF No. 60-2 at 22. The Court agrees that the privilege applies to these documents. As the FBI explained, they "were prepared as a direct result of conversations between [special agents] and attorneys with the DOJ [Office of General Counsel] and under their advice and direction . . . with the reasonable anticipation of litigation," *i.e.*, criminal proceedings against Dalal. Fourth Hardy Decl. ¶ 43. The FBI goes on to briefly describe the nature of each document, its author or origin, the circumstances of its creation, and the type of litigation for which the document's use was foreseeable. *See Am. Immigr. Council*, 21 F. Supp. 3d at 78. Thus, the FBI has met the requirements for invoking the attorney work-product privilege.

Dalal makes two arguments in response, but neither carries the day. He first contends that the privilege does not apply because the FBI admits that FBI special agents—not attorneys—prepared the withheld documents. ECF No. 46 at 20. But the privilege covers "material prepared by agents for the attorney as well as those prepared by the attorney himself." *United States v. Nobles*, 422 U.S. 225, 238–39 (1975). And "[w]here, as here, '[l]aw enforcement agents . . . [were] acting in a supportive role to an attorney preparing a case for indictment or prosecution, the attorney work[]product protection applies to their work product under FOIA Exemption 5.'" *Leopold v.*

32

*U.S. Dep't of Just.*, 487 F. Supp. 3d 1, 12 (D.D.C. 2020) (quoting *Jud. Watch, Inc. v. U.S. Dep't of Just.*, 391 F. Supp. 3d 43, 52 (D.D.C. 2019)), *aff'd*, 806 F. App'x 5 (D.C. Cir. 2020)).

Dalal's second argument—that the FBI has not described the documents in sufficient detail—fares no better. *See* ECF No. 46 at 20. Courts do not require an elaborate description, and the FBI has met the basic requirements. *See, e.g.*, *Roseberry-Andrews v. U.S. Dep't of Homeland Sec.*, 299 F. Supp. 3d 9, 27 (D.D.C. 2018) ("Defendant asserts that it withheld communications and documents drafted to assist agency attorneys in litigating and managing cases (although it does not say what kind). While it would have been useful for Defendant to have provided additional information about precisely which cases these communications involve, the Court concludes that these withholdings were proper.").

For these reasons, the FBI is entitled to summary judgment on the application of Exemption 5 to the materials outlined above.

## EOUSA

EOUSA has asserted the attorney work-product privilege to withhold a seven-page email, and the Court agrees that the privilege applies. *See* Second Luczynski Decl. ¶¶ 19, 21. The withheld email contains "information related to trial preparation, trial strategy, interpretations, and personal evaluations and opinions pertinent to plaintiff's criminal case." *Id.* ¶ 19. The email was "prepared by, or at the request . . . of an attorney, and made in anticipation of, or during litigation," and, if released, would reveal "deliberations concerning asset forfeiture decisions as well as possible strategies as they relate to the case." *Id.* Specifically, the email was sent between USAO attorneys handling Dalal's prosecution and "covers various aspects in preparation of the case against" him. *Id.* ¶ 21. It is labelled "Privileged and Confidential Attorney Work Product" and includes subsections titled (1) "Summary of Relevant Facts," (2) "Prior Guidance and Anticipated

Next Steps," and (3) "Essential Elements."  *Id.*  Thus, the email "can fairly be said to have been prepared or obtained because of the prospect of the litigation."  *Am. Immigr. Council*, 21 F. Supp. 3d at 78 (cleaned up).

In response, Dalal turns to the government-misconduct exception.  Under this exception, "where there is reason to believe the documents sought may shed light on government misconduct, 'the privilege is routinely denied,' on the grounds that shielding internal government deliberations in this context does not serve 'the public's interest in honest, effective government.'"  *In re Sealed Case*, 121 F.3d 729, 738 (D.C. Cir. 1997) (quoting *Texaco P.R., Inc. v. Dep't of Consumer Affs.*, 60 F.3d 867, 885 (1st Cir. 1995)).  Dalal argues that the attorney work-product privilege is "eviscerated" because of the New Jersey U.S. Attorney's Office's "illegal and unethical scheme to elicit incriminating statement[s] from [him] through the use of an informant in violation of" Supreme Court precedent about his Sixth Amendment right to counsel.  ECF No. 40 at 24.

Dalal and EOUSA disagree over whether the government-misconduct privilege applies in the FOIA context.  *See* ECF No. 40 at 25 (quoting *Moody v. IRS*, 654 F.2d 795, 800 (D.C. Cir. 1981)); ECF No. 48 at 10 (quoting *Toensing v. U.S. Dep't of Just..*, 999 F. Supp. 2d 50, 58 (D.D.C. 2013)).  But the Court need not decide that question.  Even if it does apply, Dalal has not shown sufficient reason to believe the email may shed light on government misconduct.  He points to an investigation of prosecutors' use of jailhouse informants in unrelated cases in California.  *See* ECF No. 40 at 14–16.  And he cites a report and recommendation—also in an unrelated case—in which a magistrate judge, in suppressing recorded conversations allegedly elicited by the same jailhouse informant at issue here, was critical of prosecutors' use of the informant.  *See* ECF No. 40 at 12–14; ECF No. 48 at 10.  And even in that case, the magistrate judge credited the government for repeatedly instructing the alleged informant not to discuss the defendant's pending case with the

defendant.  *See* ECF No. 40 at 16.  Dalal seems to think that something similar happened to him here, but he has no real proof of that.  In the end, Dalal has not come close to providing sufficient justification to eviscerate the attorney work-product privilege.

Thus, the Court finds that the privilege applies and will therefore grant EOUSA's motion for summary judgment as to this email.[10]

### d.    Exemption 6

Only FEMA asserts Exemption 6 as the sole basis to withhold certain material.  This exemption provides that agencies may withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  Courts "generally follow a two-step process when considering withholdings or redactions under Exemption 6."  *AILA*, 830 F.3d at 673.

First, courts "determine whether the [records] are personnel, medical, or 'similar' files covered by Exemption 6."  *Id.* (alteration in original) (quoting *Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1228 (D.C. Cir. 2008)).  When deciding whether documents constitute "similar files" under Exemption 6, the D.C. Circuit has instructed courts to "look not to the nature of the files that contain the information sought in a FOIA request, but to the nature of the information requested."  *N.Y. Times Co. v. Nat'l Aeronautics & Space Admin.*, 920 F.2d 1002, 1006 (D.C. Cir. 1990) (en banc) (internal quotation marks omitted) (quoting *U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 602 (1957)).  "The information need not be intimate," *id.*, because "[a]ll information which applies to a particular individual is covered by Exemption 6." *Wash. Post Co. v. U.S. Dep't*

---

[10] EOUSA also asserts that the deliberative process privilege covers the same email.  But the Court need not consider that privilege's application, as the email is properly withheld under the attorney work-product privilege.

*of Health & Hum. Servs.*, 690 F.2d 252, 260 (D.C. Cir. 1982) (internal quotation marks omitted) (citing *U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 600 (1982)).

Second, if the records are covered by the exemption, courts must determine whether disclosure "would constitute a clearly unwarranted invasion of personal privacy." *Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1228 (D.C. Cir. 2008) (quoting 5 U.S.C. § 552(b)(6)). To do this, courts ask whether "disclosure would compromise a substantial, as opposed to a *de minimis*, privacy interest." *AILA*, 830 F.3d at 674 (internal quotation marks omitted) (quoting *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 33 (D.C. Cir. 2002)). Then, they weigh the privacy interest at stake "against the public interest (namely, 'the basic purpose of the Freedom of Information Act,' which is 'to open agency action to the light of public scrutiny.'")." *Horowitz v. Peace Corps*, 428 F.3d 271, 278 (D.C. Cir. 2005) (internal quotation marks omitted) (citing *Dep't of Air Force v. Rose*, 425 U.S. 352, 372–73 (1976)).

FEMA withheld in part documents falling within three categories: award letters, "Non-Profit Security Grant Program investment justifications," and applications for federal assistance. *See* Neuschaefer Decl. at 48–58 ("FEMA Index"). As for the award letters, FEMA redacted the names and phone numbers of third-party individuals from a state agency. *Id.* at 50. In the investment justifications, it withheld "(1) the names of third party local law enforcement individuals, (2) the names of individuals associated with the organization applying for the [Non-Profit Security Grant Program] Award who are responsible for managing the security upgrades, and (3) the names of third party individuals associated with an entity that conducted a security assessment on behalf of the applicant." *Id.* Finally, in applications for federal assistance, it redacted "the names, phone

number, and email of third party individuals associated with the organization seeking federal as-sistance and who are part of the organization's membership." *Id.* The Court agrees with FEMA that Exemption 6 justifies these withholdings.

Here, all the withheld information easily constitutes "similar files" because names, phone numbers, and emails "can be identified as applying to" specific individuals. *Ayuda, Inc. v. Fed. Trade Comm'n*, 70 F. Supp. 3d 247, 264 (D.D.C. 2014). And the balancing inquiry favors with-holding the information described above. "[I]ndividuals have a substantial privacy interest in per-sonal information such as their telephone numbers and addresses," and "releasing the personal information of third parties . . . does not 'contribut[e] significantly to public understanding of the operations or activities of the government.'" *Roseberry-Andrews*, 299 F. Supp. 3d at 30 (quoting *Dep't of Def. v. Fed. Lab. Rels. Auth.* ("*FLRA*"), 510 U.S. 487, 495 (1994)); *see also Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 875 (D.C. Cir. 1989) ("The privacy interest of an individual in avoiding the unlimited disclosure of his or her name and address is significant."). On top of that, FEMA persuasively argues that "[i]f the private information of applicants, recipients and managers of these grants were made public, a significant number of individuals would be endangered." ECF No. 19 at 9. Indeed, many applicants, recipients and managers are linked to synagogues and other Jewish organizations, and there has been a "surge in anti-Semitic threats" in the form of "100 bomb threats . . . against Jewish centers and schools in the United States and Canada" in one recent year alone. *Id.* at 8–9; *see also see Ayuda, Inc.*, 70 F. Supp. 3d at 267 (finding there was "a substantial privacy interest" in having names and addresses of certain indi-viduals not disclosed when "the release of such information may result in economic and physical danger" to those individuals).

Dalal attacks the withholdings by claiming that "FEMA has used the unpersuasive cover of Exemption 6 to shroud the names of applicants, recipients, and managers of millions of dollars in grants distributed to synagogues and other Jewish organizations." ECF No. 16 at 29. He asserts that there is a public interest in uncovering potential fraud like that found in a California case in which the defendants happened to be Jewish, *id.* at 34, and in FEMA's response to the 2004 hurricane season in Florida, *id.* at 33. But Dalal has pointed to no evidence of fraud in the grants here. And it remains unclear how releasing the names of third parties would inform public understanding of *government* activities.

In the end, the Court agrees with FEMA and finds that its withholdings under Exemption 6 are proper. Thus, it grants FEMA's motion for summary judgment on these withholdings.

### e.    Exemption 7

The FBI, EOUSA, and FEMA all invoke at least one of Exemption 7's sub-parts. "Exemption 7 protects from disclosure 'records or information compiled for law enforcement purposes,' but only to the extent that disclosure of such records would cause an enumerated harm listed in Exemption 7's subsections." *Miller v. U.S. Dep't of Just.*, 872 F. Supp. 2d 12, 24 (D.D.C. 2012) (citing 5 U.S.C. § 552(b)(7)). "To fall within Exemption 7, documents must first meet a threshold requirement: that the records were 'compiled for law enforcement purposes.'" *Pub. Emps. for Env't. Resp. v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mexico ("PEER")*, 740 F.3d 195, 202–03 (D.C. Cir. 2014) (citing 5 U.S.C. § 552(b)(7)). "Agencies classified as law enforcement agencies . . . receive deference to their assertion that documents were compiled for a law enforcement purpose." *100Reporters LLC*, 248 F. Supp. 3d at 159 (citing *Pratt v. Webster*, 673 F.2d 408, 418 (D.C. Cir. 1982)). But "not every document compiled by a law enforcement agency is compiled for a law enforcement purpose." *Id.* Instead, "the agency's activity 'must be related to the enforcement of federal laws or to the maintenance of national security,'" and "the

nexus between the [activity] and one of the agency's law enforcement duties must be based on information sufficient to support at least 'a colorable claim' of its rationality." *Pinson v. U.S. Dep't of Just.*, 202 F. Supp. 3d 86, 101–02 (D.D.C. 2016) (alteration in original) (quoting *Pratt*, 673 F.2d at 420–21).

All three agencies have met this threshold to invoke Exemption 7.  To begin, "an assertion by the FBI that the records are for a law enforcement purpose is entitled to deference because the FBI is a law enforcement agency." *Doe v. U.S. Dep't of Just.*, 790 F. Supp. 17, 20 (D.D.C. 1992) (citing *Pratt*, 673 F.2d at 414, 418–19).  But in any event, it is plain the documents at issue were so compiled, specifically in connection with "the FBI's criminal investigation into [Dalal's] crimes involving religious discrimination, use of force and/or violence, acts of terrorism, and domestic terrorism," Second Hardy Decl. ¶ 64.  Dalal does not dispute that the FBI easily clears this threshold.  Similarly, as for EOUSA, "[a]ll the information at issue was compiled . . . to facilitate the investigation and criminal prosecution of plaintiff."  Second Luczynski Decl. ¶ 25.  And again, Dalal does not appear to object to that conclusion.

FEMA's case is slightly more complicated, but ultimately the Court sides with the agency. When dealing with a mixed-function agency like FEMA that has responsibilities besides law enforcement, courts "must scrutinize with some skepticism the particular purpose claimed for disputed documents redacted under FOIA Exemption 7." *Pratt*, 673 F.2d at 418.  But even doing so, the Court has little trouble concluding that the security grant documents at issue qualify.  The "ordinary understanding of law enforcement includes . . . proactive steps designed to prevent criminal activity and to maintain security." *PEER*, 740 F.3d at 203 (quoting *Milner*, 562 U.S. at 582 (Alito, J., concurring)).  "Likewise, steps by law enforcement officers to prevent terrorism surely fulfill [l]aw enforcement purposes." *Id.* (quoting *Milner*, 562 U.S. at 583 (Alito, J., concurring)

(internal quotation omitted)).  FEMA's "Non-Profit Security Grant Program provides support for target hardening and other physical enhancements to nonprofit organizations at high risk of terrorist attack" and fosters "coordination and collaboration in emergency preparedness activities among public and private community representatives, as well as state and local government agencies." ECF No. 19 at 13.  Thus, these "steps by [FEMA] to prevent terrorism surely fulfill [l]aw enforcement purposes."  *PEER*, 740 F.3d at 203 (quoting *Milner*, 562 U.S. at 583 (Alito, J., concurring) (internal quotation omitted)).

Because the Court finds that each Defendant meets the threshold requirement for Exemption 7, it turns to their withholdings under the exemption's various subparts.

### i.        Exemption 7(A)

The FBI invoked Exemption 7(A) to withhold in full 26 pages of records from the investigation into Dalal's crimes, including, but not limited to, electronic communications, intelligence write-ups, interview forms, interview forms and notes, and surveillance logs.  Second Hardy Decl. ¶ 67; *see* ECF 60-2 at 5, 7, 16.  But the Court cannot, at this point, find this invocation proper because of developments since the parties briefed this issue.

Exemption 7(A) protects from disclosure "records or information compiled for law enforcement purposes" if disclosure "could reasonably be expected to interfere with enforcement proceedings."  5 U.S.C. § 552(b)(7)(A).  The agency must "demonstrate that 'disclosure (1) could reasonably be expected to interfere with (2) enforcement proceedings that are (3) pending or reasonably anticipated.'"  *CREW v. U.S. Dep't of Just.*, 746 F.3d 1082, 1096 (D.C. Cir. 2014) (quoting *Mapother v. U.S. Dep't of Just.*, 3 F.3d 1533, 1540 (D.C. Cir. 1993)).  Critically here, "[t]he proceeding must remain pending at the time of [the Court's] decision, not only at the time of the initial FOIA request."  *Id.* at 1098.

It is no longer clear that the records at issue could be expected to interfere with any enforcement proceedings that are "pending or reasonably anticipated." *CREW*, 746 F.3d at 1096.  At the time of the briefing, the FBI represented that the investigation into Dalal was ongoing: "[A]lthough Mr. Dalal was convicted on 17 of the 20 counts in New Jersey Superior Court in October 2016, the investigation is still pending" and "will remain pending until the criminal appeal process is complete."  Fourth Hardy Decl. ¶ 23.  But since then, Dalal's appeal has concluded.  *See New Jersey v. Dalal*, 252 A.3d 204 (N.J. Super. Ct. App. Div. 2021) (upholding Dalal's conviction and sentence).

Thus, the Court will deny without prejudice Dalal's and the FBI's motions for summary judgment as to this exemption and permit the FBI to file a supplementary declaration addressing whether any investigation or other enforcement proceeding remains pending—or whether these records are properly withheld (in full or in part) under some other FOIA exemption.

### ii.      Exemption 7(C)

The FBI and EOUSA both invoked Exemption 7(C).  Exemption 7(C) "exempts from disclosure 'records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy.'"  *CREW*, 746 F.3d at 1091 (quoting 5 U.S.C. § 552(b)(7)(C)).  Disclosure of the documents may still be required "if the individual seeking the information demonstrates a public interest in the information that is sufficient to overcome the privacy interest at issue."  *Boyd v. Crim. Div. of U.S. Dept. of Just.*, 475 F.3d 381, 386–87 (D.C. Cir. 2007).  "In order to trigger the balancing of public interests against private interests, a FOIA requester must (1) 'show that the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake,' and (2) 'show the information is likely to advance that interest.'"  *Id.* at 387 (quoting *Nat'l Archives & Recs. Admin. v.*

*Favish*, 541 U.S. 157, 172 (2004)).  When the public interest is revealing government wrongdoing, "the requester must establish more than a bare suspicion in order to obtain disclosure.  Rather, the requester must produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred."  *Favish*, 541 U.S. at 174.

**FBI**

The FBI invoked Exemption 7(C) to withhold in full or redact documents to protect the names and identifying information of (1) FBI special agents and support personnel, (2) third parties of investigative interest, (3) state and local law enforcement personnel, (4) non-FBI federal, state, and local government employees, (5) third parties "merely mentioned," (6) victims, and (7) third parties who provided information to the FBI.  Second Hardy Decl. ¶¶ 112–21.  In one instance, the FBI provided a *Glomar* response by refusing to confirm or deny whether certain documents exist because the very fact of their existence is protected by Exemption 7(C).  Second Hardy Decl. ¶ 20. The Court finds that all this information was properly withheld under Exemption 7(C), and the FBI's use of a *Glomar* response was appropriate.[11]

The Court is satisfied that releasing the withheld names and identifying information identified above "could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C).  As another court in this Circuit has pointed out, courts "have repeatedly found that it is proper to withhold names and other identifying information about law-enforcement officers and government officials under Exemption 7(C)."  *Ball v. U.S. Marshals Serv.*, No. 19-cv-1230 (JEB), 2021 WL 4860590, at *6 (D.D.C. Oct. 19, 2021), *appeal dismissed*

---

[11] The FBI also invoked Exemption 6 to withhold the same information.  But Exemption 7 has a "lower bar for withholding material," and it applies here.  *Am. Civ. Liberties Union v. U.S. Dep't of Just.*, 655 F.3d 1, 6 (D.C. Cir. 2011) (quoting *FLRA*, 510 U.S. at 496 n. 6).  Thus, the Court need not reach the FBI's Exemption 6 arguments.

*sub nom.*, No. 21-5253, 2022 WL 190757 (D.C. Cir. Jan. 14, 2022) (citing cases); *see also Rose-berry-Andrews*, 299 F. Supp. 3d at 30 (finding DHS properly withheld the names and personally identifiable information of ICE employees who "handle a myriad of tasks relating to the enforcement of federal immigration law"); *Isiwele v. Dep't of Health & Hum. Servs.*, 85 F. Supp. 3d 337, 359 (D.D.C. 2015) (finding agency properly redacted names of law enforcement personnel); *Gosen v. U.S. Citizenship & Immigr. Servs.*, 75 F. Supp. 3d 279, 290 (D.D.C. 2014) ("Because these redactions do not appear to implicate any public interest at all, USCIS properly applied Exemption[ ] . . . 7(C)."); *Brown v. FBI*, 873 F. Supp. 2d 388, 404 (D.D.C. 2012) ("In light of the employees' privacy interests, the potential for violence, and the insubstantial public interest in the names of clerical employees, defendant properly withholds the names and identifying information of FBI [Special Agents] and support personnel.").

Dalal advances two arguments that speak to the public interest at stake, but neither is persuasive.  He first renews his argument that misconduct by Special Agent Coleman and others weighs in favor of disclosure.  *See* ECF No. 46 at 23–24.  But as discussed above, he offers little more than "bare suspicion" that fails to "produce evidence that would warrant a belief by a reasonable person that . . . alleged Government impropriety might have occurred" and that these withholdings could shed light on that impropriety.[12]  *Favish*, 541 U.S. at 174.  Second, Dalal argues that the Bergen County Prosecutor's Office has "held numerous press conferences, media interviews, and issued press releases and press statements," and that "[m]any of the alleged victims have also invited publicity."  ECF No. 46 at 24.  But this Court need not reach whether these

---

[12] Similarly, the Court rejects this argument as specifically applied to Special Agent Coleman's personnel file. *See* ECF No. 46 at 39–43.

individuals have reduced privacy interests, because Dalal has not articulated a public interest that would trigger the balancing test.

As for the *Glomar* response, providing one is "proper if the fact of the existence or nonexistence of agency records falls within a FOIA exemption." *Wolf*, 473 F.3d at 374. As the D.C. Circuit put it, an agency "may refuse to confirm or deny the existence of records where to answer the FOIA inquiry would cause harm cognizable under an FOIA exception." *Gardels v. CIA*, 689 F.2d 1100, 1103 (D.C. Cir. 1982). To determine whether a *Glomar* response "fits a FOIA exemption, courts apply the general exemption review standards established in non-*Glomar* cases." *Wolf*, 473 F.3d at 374. An agency issuing a *Glomar* response must explain in as much detail as possible why it cannot confirm or deny the existence of certain records or categories of records, which it may seek to do by affidavit. *James Madison Project v. U.S. Dep't of Just.*, 208 F. Supp. 3d 265, 283 (D.D.C. 2016). If a *Glomar* response is justified, "the agency need not conduct any search for responsive documents or perform any analysis to identify segregable portions of such documents." *People for Ethical Treatment of Animals v. Nat'l Insts. of Health*, 745 F.3d 535, 540 (D.C. Cir. 2014).

Dalal requested various FBI records about Stewart, mentioned above, who he says was an FBI informant. ECF No. 57-1 at 36–38 ("Ex. K"). The FBI responded that it "can neither confirm nor deny the existence of any records responsive to your request, which, if they were to exist, would be exempt from disclosure pursuant to FOIA Exemptions (b)(6) and (b)(7)(C)." *Id.* at 54–59 ("Ex. P"). The FBI further explained in its summary judgment briefing that the requested records—various informant evaluation forms and records of communications with FBI agents—per-

tain to law enforcement proceedings and investigations, and that acknowledging whether the records exist would connect Stewart to them as an informant and potentially stigmatize him or endanger him.  *See* Second Hardy Decl. ¶¶ 156–59.

This explanation suffices.  The D.C. Circuit has "consistently supported nondisclosure of names or other information identifying individuals appearing in law enforcement records, including investigators, suspects, witnesses, and informants." *Schrecker v. U.S. Dep't of Just.*, 349 F.3d 657, 661 (D.C. Cir. 2003); *see also Nation Mag. v. U.S. Customs Serv.*, 71 F.3d 885, 894 (D.C. Cir. 1995) ("[I]ndividuals have an obvious privacy interest cognizable under Exemption 7(C) in keeping secret the fact that they were subjects of a law enforcement investigation. . . . That privacy interest also extends to . . . informants who provided information during the course of an investigation.").  Indeed, FOIA itself provides that when "informant records maintained by a criminal law enforcement agency under an informant's name or personal identifier are requested by a third party according to the informant's name or personal identifier, the agency may treat the records as not subject to the requirements of this section unless the informant's status as an informant has been officially confirmed."  5 U.S.C. § 552(c)(2); *Wilson v. U.S. Dep't of Just.*, 42 F. Supp. 3d 207, 214 (D.D.C. 2014) (agencies routinely issue *Glomar* responses in such circumstances).[13]

Dalal responds that the FBI cannot assert *Glomar* here because it "officially confirmed" that Stewart was an informant.  ECF No. 46 at 38–39.  He cites three pages of court testimony in which he says that the FBI confirmed Stewart's status.  *Id.*  But none of those passages show that.  *Id.*  The first two mention only "the source" and provide no name.  *Id.*  The third *does* identify

---

[13] Similarly, the Court upholds the FBI's *Glomar* response about any disciplinary records relating to Special Agent Coleman because he has an obvious privacy interest in the nondisclosure of the very existence of any such records.  And Dalal's allegations of misconduct do not show a public interest in those records sufficient to outweigh that privacy interest.

Stewart by name, but that testimony was provided by a state law enforcement officer, not the FBI, *id.* at 39, and agencies may "give a *Glomar* response despite the prior disclosure of another, unrelated agency." *ACLU v. CIA*, 710 F.3d 422, 429 n.7 (D.C. Cir. 2013). Thus, Dalal has failed to meet his burden to show that *the FBI* confirmed that Stewart was an informant. *See id.* at 427 ("A plaintiff mounting an official acknowledgment argument must bear the initial burden of pointing to specific information in the public domain that appears to duplicate that being withheld.") (cleaned up).

Given all the above, the Court will grant the FBI's motion for summary judgment as to the information withheld and *Glomar* response provided under Exemption 7(C).

**EOUSA**

EOUSA invoked Exemption 7(C) to withhold in its entirety a 24-page search warrant application. Second Luczynski Decl. ¶ 28.[14] But the Court is not convinced that withholding the application *in full* is appropriate—at least not based on the information before it. According to EOUSA, the application includes the names "of third-party individuals, such as potential witnesses and law enforcement personnel." *Id.* ¶ 26. It also details the declarant's qualifications, contains "accounts of third parties who provided information," and includes "transcripts of conversations gathered by law enforcement personnel." *Id.* ¶ 28. But the inclusion of all this information does not justify "withhold[ing] [the] responsive document *in toto*." *CREW*, 746 F.3d at 1094. Circuit precedent "does not permit an agency 'to exempt from disclosure *all* of the material in an investigatory record solely on the grounds that the record includes some information which identifies a

---

[14] Like the FBI, EOUSA also invokes Exemption 6. But because Exemption 7(C) provides "a lower threshold than the one set forth in Exemption 6," the Court need not consider arguments for both exemptions. *Boyd v. EOUSA*, 87 F. Supp. 3d 58, 72 (D.D.C. 2015).

private citizen or provides that person's name and address.'" *Id.* (quoting *Nation Mag.*, 71 F.3d at 896).

None of this means that EOUSA must disclose the entire application.  Some of the information in it is almost certainly exempt.  For example, "the names and identifying information of third parties contained in investigative files are presumptively exempt." *CREW*, 746 F.3d at 1094. And if other information in the application "would reveal the identities of individuals who are subjects, witnesses, or informants in law enforcement investigations, those portions of [the application] . . . are categorically exempt from disclosure." *Nation Mag.*, 71 F.3d at 896.  But at this point EOUSA has not justified its blanket withholding.[15]

Thus, the Court will deny EOUSA's and Dalal's motions for summary judgment without prejudice as to this document.  EOUSA "must attempt to make a more particularized showing as to what documents or portions thereof are exempt" and this Court will then "weigh what information may be withheld under Exemption 7(C) and whether any information is reasonably segregable and may be disclosed." *CREW*, 746 F.3d at 1096.

### iii.        Exemption 7(D)

Only the FBI invoked Exemption 7(D), claiming it justifies its redacting of names, identifying information, and intelligence information from eight pages of documents.  *See* ECF No. 32 at 35; ECF No. 60-2 at 17–18.  The Court agrees that it does.

Exemption 7(D) "exempts records or information compiled for law enforcement purposes" if the disclosure "could reasonably be expected to disclose the identity of a confidential source."

---

[15] Dalal also argues that purported government misconduct supports disclosure. *See* ECF No. 40 at 27–30.  But as with his same arguments relating to the FBI's withholdings under Exemption 7(C), the Court is not persuaded.

5 U.S.C. § 552 (b)(7)(D).  A source is "confidential" under Exemption 7(D) if "the source 'pro-vided information under an express assurance of confidentiality or in circumstances from which such an assurance could be reasonably inferred.'"  *Williams v. FBI*, 69 F.3d 1155, 1159 (D.C. Cir. 1995) (quoting *U.S. Dep't of Just. v. Landano*, 508 U.S. 165, 170–74, (1993)).  "[W]hen the FBI contends that a source received an express assurance of confidentiality, it must . . . present suffi-cient evidence that such an assurance was in fact given."  *Roth v. U.S. Dep't of Just.*, 642 F.3d 1161, 1184 (D.C. Cir. 2011); *see also CREW*, 746 F.3d at 1102 (the agency must "present proba-tive evidence that the source did in fact receive an express grant of confidentiality").  Without an express assurance of confidentiality, "courts consider a number of factors to determine whether the source nonetheless 'spoke with an understanding that the communication would remain confi-dential.'"  *Id.* at 1184 (quoting *Landano*, 508 U.S. at 172).  "The nature of the crime investigated and the informant's relation to it are the most important factors in determining whether implied confidentiality exists."  *Skinner v. U.S. Dep't of Just.*, 744 F. Supp. 2d 185, 212 (D.D.C. 2010).

The FBI argues that both implied and express assurances of confidentiality support its re-dactions here.  It first explains that it withheld information provided by high school employees and others during an investigation into Dalal's bomb threats on a high school "under implied assur-ances of confidentiality."  Second Hardy Decl. ¶¶ 125–26.  Dalal does not seek information about that investigation, ECF No. 46 at 25, so summary judgment will be granted in favor of the FBI as to those withholdings.  *See Peter S. Herrick's Customs & Int'l Trade Newsl. v. U.S. Customs &*

*Border Prot.*, No. 04-cv-377 (JDB), 2006 WL 1826185, at *4 (D.D.C. June 30, 2006) (granting summary judgment for agency on information plaintiff did not seek).[16]

The FBI also withheld information because of express assurances of confidentiality.   It withheld (1) "information provided by confidential source symbol numbered informants"; (2) "confidential source symbol numbers"; and (3) "names, identifying information about, and/or information provided by sources under express assurances of confidentiality."   Fourth Hardy Decl. ¶ 52.[17]   In support, the FBI details the sensitive nature of the confidential source symbol numbered informants' work and verifies that the informants are given "express assurance that the FBI will . . . keep their identities and the information they provided confidential."   Second Hardy Decl. ¶¶ 128–30.   As the FBI states, "the mere assignment of a source symbol number to an informant indicates an express assurance of confidentiality."   Fourth Hardy Decl. ¶ 53.   And, according to the FBI, revealing source numbers would allow someone to piece together the subject matter to which different informants are tied, giving clues as to any informant's identity.   Second Hardy Decl. ¶ 132.   "Repeated release" would only further "narrow the possibilities of the[] informants' true identities."   *Id.*   As for the "names, identifying information about, and/or information provided by" other sources, the sources, "specifically requested that their identities not be revealed due to fear of reprisal."   Second Hardy Decl. ¶ 134.

---

[16] Dalal seems to think that there is a second bucket of information withheld related to this investigation because of implied assurances of confidentiality—"information within records categorically exempt under (b)(7)(A)."   ECF No. 46 at 25.   But that is not how the Court reads the FBI's declaration.   *See* Second Hardy Decl. ¶ 125–26 & n.36.

[17] "Confidential source symbol" numbered informants are individuals who regularly report information to the FBI and—as the name suggests—are assigned confidential numbers to protect their identities.   *See* Second Hardy Decl. ¶¶ 127–29.

Despite Dalal's claims to the contrary, these explanations show that disclosure "could reasonably be expected to disclose the identity of a confidential source." 5 U.S.C. § 552 (b)(7)(D). Indeed, courts have found nearly identical explanations sufficient. *See Clemente v. FBI*, 741 F. Supp. 2d 64, 87 (D.D.C. 2010) (finding an explanation that confidential source symbol numbered informants "report information to the FBI on a regular basis pursuant to an 'express' grant of confidentiality" to be an adequate explanation for Exemption 7(D)); *Touarsi*, 78 F. Supp. 3d at 348 (finding the "declaration . . . sufficient to establish that each source is confidential" where the FBI explained that it "only assigns symbol designations to informants who are given express assurances of confidentiality, and that each of these informants has been assigned such a designation"); *Campbell v. U.S. Dep't of Just.*, 164 F.3d 20, 34 (D.C. Cir. 1998), *as amended* (Mar. 3, 1999) ("[P]robative evidence that the source did in fact receive an express grant of confidentiality . . . [can] include[e] . . . a statement by the source.").

Thus, the Court will grant the FBI summary judgment for its remaining Exemption 7(D) withholdings.

### iv.        Exemption 7(E)

Both the FBI and FEMA invoked Exemption 7(E). This exemption protects all information compiled for law enforcement purposes when release "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E).

The "requirement that disclosure risk circumvention of the law 'sets a relatively low bar for the agency to justify withholding.'" *PEER*, 740 F.3d at 205 (quoting *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011)). "Rather than requiring a highly specific burden of showing how the law will be circumvented, exemption 7(E) only requires that the [agency] demonstrate logically

how the release of the requested information might create a risk of circumvention of the law."
*Gilman v. U.S. Dep't of Homeland Sec.*, 32 F. Supp. 3d 1, 18 (D.D.C. 2014) (alteration in original)
(quoting *Blackwell*, 646 F.3d at 42).

**FBI**

The FBI invoked Exemption 7(E) to withhold in full and in part dozens of documents that
contain fifteen categories of information: (1) the "location and identity of FBI and/or Joint Units,
Squads, and/or Divisions," (2) "[d]ates and types of investigation – [p]reliminary or full investi-
gations," (3) "[m]ethods for collection/analysis of information," (4) "[i]nformation about the in-
stallation, locations, monitoring and types of devices utilized in surveillance," (5) "Suspicious Ac-
tivity Report information," (6) "[d]atabase information and/or printouts from non-public data-
bases," (7) "[i]nvestigative focus of specific investigations," (8) "[i]nternal FBI email or IP ad-
dress/Intranet Web Address," (9) "[s]ensitive file number or subfile names," (10) "[s]trategy uti-
lizing particular evidence," (11) "Computer Analysis Response Team ("CART") reports and/or
data," (12) "[o]perational directives about sensitive investigative techniques and strategies," (13)
"[s]pecific law enforcement techniques utilized to conduct national security investigations,"
(14) "[s]tatistical information contained in effectiveness rating FD-515," and (15) "[m]onetary
payments."  ECF No. 32 at 38–40; Second Hardy Decl. ¶¶ 138–153.  The Court finds that these
withholdings were proper.

For each category, the FBI has explained how the release of the information "logically . . .
might create a risk of circumvention of the law."  *Blackwell*, 646 F.3d at 42.  For example, it claims
that releasing "the location of the units conducting the investigation would reveal the targets" and
"the physical areas of the interest of the investigation," and could "allow hostile analysts to deter-
mine where geographically the FBI is focusing its investigative resources."  Second Hardy Decl.

51

¶ 138.  And the withholding of "[joint] units, squads and/or divisions involved is justifiable . . . under a similar rationale."  *Id.*  Releasing the dates and types of investigations, the FBI says, would "allow individuals to know the types of activities that would trigger a trigger a full investigation . . . and the particular dates that the investigation covers, which would allow individuals to adjust their behavior accordingly."  *Id.* ¶ 139.  Further, releasing the methods the FBI uses to collect and analyze information would show "how and from where the FBI collects information and the methodologies employed to analyze it," which "would enable subjects of FBI investigations to circumvent similar currently used techniques."  *Id.* ¶ 140.  In the end, the FBI sufficiently describes for each category how release of the information would risk circumvention of the law.  Thus, the Court is satisfied that the FBI has met its burden.  *See Shapiro v. U.S. Dep't of Just.*, No. 12-cv-313 (BAH), 2020 WL 3615511, at *35–41 (D.D.C. July 2, 2020) (finding sufficient the FBI's use of 11 similar categories with explanations as to how release could circumvent the law).

Dalal raises several objections, but each fails to persuade.  He makes two overarching points: (1) that the FBI has not provided enough detail and (2) that the withheld documents do not qualify as a "technique or procedure."  ECF No. 46 at 29–37.  As explained above, the Court finds that the FBI has provided sufficient detail.  As for the second argument, the Court has already explained that, correctly interpreted, Exemption 7 is broader than Dalal claims, encompassing more than just the techniques or procedures themselves.  FOIA allows "[i]nformation . . . relat[ing] to law enforcement techniques, policies, and procedures [to be] withheld under this exemption." *Showing Animals Respect & Kindness*, 730 F. Supp. 2d at 199 (citing *Boyd*, 570 F. Supp. 2d at 158).

Dalal also makes a few other more specific arguments.  He contends that the first category—the location and identity of FBI and its Joint Units, Squads, and Divisions—is improperly

withheld because the "existence of the FBI's office in Newark is a matter of public knowledge as are the particular areas of interest to the FBI in northern New Jersey with regard to the investigation at issue." ECF No. 46 at 30. But for one thing, the "FBI did not withhold the existence or location of the FBI's Newark Field Office." Fourth Hardy Decl. ¶ 57. It withheld the location and identity of other squads/units/divisions. And, says the FBI persuasively, revealing the "totality" of their "geographic locations . . . would paint a vivid picture as to where and what the FBI was/is investigating and which criminal behaviors the FBI may or may not have detected." *Id.*

Next, Dalal objects to the FBI's withholding under the "sensitive case file number" category. He argues that releasing the information would not risk circumvention of law because "the agency's file number conventions are already a matter of public knowledge." ECF No. 46 at 33. But even if that were true, the FBI explains that the release of file numbers along with the file numbering convention would reveal the priority given to certain investigations. Fourth Hardy Decl. ¶ 65. Suspects could then use this information "to change their pattern of activity to avoid detection, apprehension, or create alibis for suspected activities." *Id.*

All in all, the Court finds that the FBI has properly invoked the exemption and will grant it summary judgment as to the withholdings outlined above.

## **FEMA**

FEMA invokes Exemption 7(E) to justify redactions on dozens of pages of "Non-Profit Security Grant Program" investment justifications. Neuschaefer Decl. at 49. But at this point, the Court cannot find the invocation proper.

According to FEMA, investment justifications are "document[s] . . . completed by [an] applicant to provide an explanation for the need for funding as well as how the funding will be spent." Neuschaefer Decl. at 49. The redacted information includes "[i]dentified vulnerabilities

and consequences associated with a potential terrorist attack," "[t]arget hardening activities including physical security enhancement equipment security upgrades, and inspection and screening system to protect against a potential terrorist attack," and "[t]he milestones associated with target hardening and security upgrades." *Id.* at 10–11.

Based on this information, FEMA *has* shown "logically how the release of [this] information might create a risk of circumvention of the law." *Gilman*, 32 F. Supp. 3d at 18.  Disclosure of this information would allow someone "to exploit" security grant applicants' "identified weaknesses" and "know which security systems have been upgraded and thus exploit those systems that have not," resulting "in a high risk of circumvention of the law" and the increased "threat of a terrorist attack." *Id.* at 10–11.

But the "requirement that disclosure risk circumvention of the law" is only half of the equation.  FEMA still must show that the information withheld at least "relat[es] to guidelines, techniques, sources, and procedures for law enforcement investigations and prosecutions." *Tax Analysts v. IRS*, 294 F.3d 71, 79 (D.C. Cir. 2002); *see also PEER*, 740 F.3d at 205 n.4 ("Exemption 7(E) covers techniques and procedures for law enforcement investigations or prosecutions as well as guidelines for law enforcement investigations or prosecutions.  The exemption's final, qualifying clause requires that an agency demonstrate that the disclosure of the records at issue could reasonably be expected to risk circumvention of the law." (cleaned up)).

FEMA states without explanation that the redacted categories of information are "techniques and procedures." Neuschaefer Decl. at 10.  But it is not immediately clear how information provided by third parties for funding grants even relates to "techniques and procedures for law enforcement investigations or prosecutions." 5 U.S.C. § 552(b)(7)(E).  Perhaps this information

54

shows how law enforcement assesses the risk of terrorist attacks.  Or how law enforcement prior-itizes different security vulnerabilities.  Maybe the forms "describe how law enforcement person-nel might investigate" a terrorist attack against one of the applicants.  *PEER*, 740 F.3d at 205.  In any event, FEMA "does not make clear with reasonable specificity what procedures are involved and how they would be disclosed."  *Whittaker v. U.S. Dep't of Just.*, No. 18-cv-01434 (APM), 2019 WL 2569915, at *3 (D.D.C. June 21, 2019) (cleaned up).  And "the agency must at least provide *some* explanation of what procedures are involved and how they would be disclosed." *CREW*, 746 F.3d at 1102.

For these reasons, this Court cannot find that FEMA's withholdings under Exemption 7(E) were proper.  It will, however, give FEMA another opportunity to explain how the withheld infor-mation relates to "techniques and procedures for law enforcement investigations or prosecutions" or how it relates to "guidelines for law enforcement investigations or prosecutions."  5 U.S.C. § 552(b)(7)(E).  Thus, the Court will deny without prejudice FEMA's request for summary judgment on these 7(E) withholdings.[18]

### 3.   Segregability

The last issue before the Court is segregability.  FOIA requires that an agency provide "[a]ny reasonably segregable portion of a record . . . after deletion of the portions which are ex-empt," 5 U.S.C. § 552(b)(9), "unless the exempt portions are 'inextricably intertwined with exempt portions,'" *Johnson v. Exec. Off. for U.S. Atty's*, 310 F.3d 771, 776 (D.C. Cir. 2002) (quoting *Mead Data Cent., Inc.*, 566 F.2d at 260).  Segregability is judged using a burden-shifting framework.

---

[18] The Court will also deny without prejudice that part of Dalal's cross-motion directed at FEMA in which he seeks summary judgment for his policy-and-practice claim against FEMA.  *See* ECF No. 16 at 44–47.  Upon a renewed cross-motion by Dalal, FEMA's additional explanation as to these 7(E) withholdings, and additional briefing by FEMA, the Court will have a fuller picture whether summary judgment is warranted for either party on this claim.

First, an agency must provide a "detailed justification" for the non-segregability of the withheld information, although not "so much detail that the exempt material would be effectively disclosed." *Id.* Agencies typically meet their initial burden by providing a sufficiently detailed *Vaughn* index and "a declaration attesting that the agency released all segregable material." *Jud. Watch, Inc. v. U.S. Dep't of Just.*, 20 F. Supp. 3d 260, 277 (D.D.C. 2014). "Agencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material." *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007). The plaintiff must then produce a "quantum of evidence" rebutting this presumption, at which point "the burden lies with the government to demonstrate that no segregable, nonexempt portions were withheld." *Id.*

**FBI**

The FBI has met its burden in part. It attests that it "released all reasonably segregable non-exempt information from documents responsive to Plaintiff's" requests. Second Hardy Decl. ¶ 168. The FBI adds that after identifying 412 pages of responsive records, it found "that 188 pages could be released in full without redaction as there was no foreseeable harm in an interest protected by a FOIA exemption" and "that 224 pages could be released in part with redactions pursuant to" certain FOIA exemptions. *Id.* ¶ 167. It also asserts that the withheld information "was either exempt itself or was so intertwined with non-exempt information that segregation of the non-exempt information was not reasonably possible without revealing exempt information or leaving nothing by meaningless words or sentence fragments." *Id.* When this explanation is paired with the descriptions of the withholdings and redactions in the FBI's *Vaughn* index, ECF No. 60-2, the Court is persuaded that the FBI is entitled to the presumption for documents that the Court

found properly withheld and redacted above. *See Jud. Watch, Inc.*, 20 F. Supp. 3d at 277.[19]  As for documents withheld or containing redactions under Exemptions 5's deliberative process privilege and Exemption 7(A), however, the Court will reserve ruling on segregability until the FBI files supplemental declarations properly justifying its redactions and withholdings.  Thus, the Court will grant the FBI summary judgment in part as to the segregability requirement.

### EOUSA

EOUSA has likewise met the segregability requirement in part.  EOUSA attests that it "considered the segregability of the requested records" and that "no reasonably segregable non-exempt information was withheld from plaintiff."  Second Luczynski Decl. ¶ 29.  It also asserts that the "records were reviewed page-by-page, line-by-line" and that "any nonexempt information was inextricably intertwined with the exempt records." *Id.*  Then, as explained above, EOUSA described its redactions and withholdings in sufficient detail in its declarations.  Thus, EOUSA qualifies for the presumption, and Dalal's arguments about a lack of detail fall flat.  Still, for the search warrant application withheld in full under Exemption 7(C), the Court will reserve ruling on the segregability until EOUSA submits supplemental declarations properly justifying any withholdings.  So the Court will grant EOUSA summary judgment in part on segregability.

### FEMA

FEMA has also met its burden in part.  It attests that it "reviewed each record line to identify information exempt from disclosure" and that "all information not exempted from disclosure . . . was correctly segregated and non-exempt portions released."  Neuschaefer Decl. ¶¶ 21–22. FEMA also provided a *Vaughn* index that, as explained above, adequately explains FEMA's withholdings

---

[19] Dalal's arguments to the contrary ignore the FBI's *Vaughn* index.  *See* ECF No. 46 at 44.

under each exemption invoked.  Based on these submissions, FEMA is entitled to a presumption that it produced all reasonably segregable information.  *See Jud. Watch, Inc.*, 20 F. Supp. 3d at 277.  In turn, Dalal has not produced a "quantum of evidence" rebutting this presumption; indeed, he does not appear to contest segregability as to FEMA at all.  That said, the Court will reserve ruling on segregability for FEMA's Exemption 7(E) withholdings until FEMA submits supplemental declarations to justify them.  Thus, the Court will grant FEMA summary judgment in part on segregability.

**IV.   Conclusion and Order**

For all the above reasons, it is hereby **ORDERED** that FEMA's motion for summary judgment, ECF No. 14, is **GRANTED IN PART AND DENIED WITHOUT PREJUDICE IN PART**.

It is further **ORDERED** that EOUSA's motion for summary judgment, ECF No. 27, is **GRANTED IN PART AND DENIED WITHOUT PREJUDICE IN PART**.

It is further **ORDERED** that the FBI's motion for summary judgment, ECF No. 32, is **GRANTED IN PART AND DENIED WITHOUT PREJUDICE IN PART**.

It is further **ORDERED** that FEMA's motion to strike, ECF No. 37, is **DENIED**.

It is further **ORDERED** that Dalal's cross-motions for summary judgment, ECF Nos. 16, 40, and 46 are **DENIED IN PART AND DENIED WITHOUT PREJUDICE IN PART**.

It is further **ORDERED** Dalal's motion for leave to file a supplemental exhibit, ECF No. 55, is **GRANTED**.

It is further **ORDERED** that each party shall file a proposed schedule to govern further proceedings in this case by January 6, 2023.

**SO ORDERED.**

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: November 21 , 2022